# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RYAN S. WATSON, individually and as ) 
Trustee of the Watson Family Gun Trust, ) 
 ) 
    Plaintiff, ) 
 )    Civil Action No. 2:14-cv-6569-SD
         v. ) 
 ) 
ERIC H. HOLDER, JR., , Attorney General of ) 
the United States, and B. TODD JONES, ) 
Director, Bureau of Alcohol, Tobacco, Firearms ) 
& Explosives, ) 
 ) 
    Defendants. 

---

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

STATUTORY AND REGULATORY BACKGROUND ............................................. 2

FACTUAL BACKGROUND ......................................................................................... 6

STANDARD OF REVIEW ........................................................................................... 7

ARGUMENT .................................................................................................................. 8

    I.   The Court Should Dismiss Plaintiff's Second Amendment and Commerce Clause Claims for Lack of Subject Matter  Jurisdiction Because Plaintiff Fails to Satisfy the Traceability and Redressability Requirements for Standing.................................................... 8

    II.    The Court Should Dismiss Plaintiff's Claims for Failure to State a Claim. ............... 11

        A.    The Challenged Laws Are Consistent with the Second Amendment. .................. 11

           1.   The Challenged Laws Do Not Burden Conduct Protected by the Second Amendment. ................................................................................. 13

               a.   The Second Amendment Does Not Protect an Individual Right  to Possess Machine Guns. .................................................................... 13

               b.   Restrictions on the Possession of Machine Guns Are Longstanding and Presumptively Lawful. ................................................ 17

           1.   Because Any Burden Imposed by the Challenged Federal Laws Is Minimal, No Heightened Constitutional Scrutiny Is Warranted. ................................................. 21

           2.   18 U.S.C. § 922(o) Satisfies Intermediate Scrutiny. ........................................... 24

        B.  Congress Acted Within Its Commerce Power When It Enacted the GCA and FOPA... .................................................................................... 26

        C.  The Challenged Federal Laws Are Consistent with Principles of Due Process  …..... 30

        D.  The Court Should Dismiss Plaintiff's Equal Protection and Detrimental Reliance Claims Because Plaintiff Has Failed to Establish the Necessary Elements................ 34

           1.   ATF Has Not Violated the Equal Protection Component of the Due Process Clause................................................................................ 34

           2.   The Court Should Dismiss Plaintiff's Detrimental Reliance Claim Because ATF's Mistaken Approval of His Application Does Not Give Rise to a Detrimental Reliance Claim Against the Federal Government. .......................... 36

CONCLUSION ............................................................................................................. 39

## INTRODUCTION

Decades of federal laws and regulations properly restrict the manufacture and possession of machine guns by civilians to protect members of the public and law enforcement officers from "lethal weapons . . . [that] could be used readily and efficiently by criminals or gangsters" in furtherance of criminal activity. *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (*quoting* H.R. Rep. No. 83-1337, at A395 (1954), *reprinted at* 1954 U.S.C.C.A.N. 4017, 4542) (attached as Ex. 1). In this lawsuit, Plaintiff claims that these longstanding federal laws are invalid under the Second, Fifth, and Fourteenth Amendments, and, moreover, that Congress lacks the Constitutional authority to enact such laws in the first instance. Plaintiff's claims are without merit, and he is not entitled to relief.

As an initial matter, the Court lacks subject matter jurisdiction over Plaintiff's Commerce Clause and Second Amendment claims because Plaintiff lacks standing to challenge the federal limitations on machine guns: Pennsylvania law, against which Plaintiff raises no claims, independently bars Plaintiff's manufacture of a machine gun. Plaintiff's constitutional reasoning is also flawed. In light of the historical tradition of "prohibiting the carrying of 'dangerous and unusual weapons,'" and the Supreme Court's recognition of the constitutionality of restrictions on machine gun possession, there is no merit to Plaintiff's Second Amendment claims. *District of Columbia v. Heller*, 554 U.S. 570, 624, 627 (2008) (internal citations omitted). Decades of settled precedent likewise foreclose Plaintiff's allegation that regulation of machine guns lies outside Congress's enumerated powers. Further, Plaintiff has failed to plead a cognizable equal protection claim, and in any event, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") may properly distinguish between Plaintiff and unidentified others without running afoul of equal protection principles. Finally, Plaintiff is mistaken to suggest that the Constitution

1

forbids ATF from correcting the erroneous approval of his application to make a machine gun, or that such erroneous approval (or his subsequent actions to manufacture a machine gun) give rise to a claim of equitable estoppel.  Rather, ATF has inherent authority to correct its mistakes and, because neither ATF's administrative error nor Plaintiff's manufacture of a machine gun create a property interest protected by the Fifth Amendment, the agency may properly reverse its decision and require that Plaintiff surrender the firearm he manufactured.  The Court should therefore dismiss Plaintiff's claims or, in the alternative, enter summary judgment for Defendants.

## STATUTORY AND REGULATORY BACKGROUND

Congress has enacted an interconnected framework of federal laws regulating the interstate firearm market, and the claims in this case arise out of the interplay of two of these statutes: the Gun Control Act of 1968 ("GCA"), as amended, 18 U.S.C. Chapter 44; and the National Firearms Act of 1934 ("NFA"), 26 U.S.C. Chapter 53.  Plaintiff's suit challenges the constitutionality of the manner in which these statutes regulate the making, possession, and transfer of machine guns.[1]  As discussed more fully below, the GCA, with certain exceptions, generally makes it unlawful for a person to transfer or possess a machine gun.  *See* 18 U.S.C. § 922(o).  The making of a machine gun, in violation of the provisions of the NFA, is also unlawful.  *See* 26 U.S.C. § 5861(f).  ATF is charged with the administration and enforcement of the GCA and the NFA, and is overseen by the Defendants.  *See* 28 C.F.R. § 0.130(a)(1).

The NFA, the first major federal statute to deal with firearms, required all persons engaged in the business of selling "firearms" (including machine guns)[2] and all firearms owners

---

[1] In this brief, except where directly quoting the statute or derivative interpretations, Defendants will use the ordinary spelling of "machine gun" as two words, rather than the single-word spelling used in the NFA: "machinegun."  *See* 26 U.S.C. § 5845(b).

[2] Although the NFA applies to "firearms," the term "firearms" is defined within as a small set of dangerous weapons, not the full class of weapons encompassed by the meaning of "firearms" in ordinary English.  *See* 28 U.S.C. § 5845.  "Firearms" thus includes machine guns, short-barreled shotguns, short-barreled rifles, and several

to register with the Collector of Internal Revenue, subjected all firearm sales to a special tax, and required that firearms transactions be conducted using written order forms.[3]  Congress enacted the NFA to target "lethal weapons . . . [that] could be used readily and efficiently by criminals or gangsters."  H.R. Rep. No. 83-1337, at A395, 1954 U.S.C.C.A.N. at 4542.   Among its requirements, the statute provided for the creation of a "central registry of all firearms in the United States," the National Firearms Registration and Transfer Record, to be maintained by the Attorney General, in which each firearm manufactured, made, or imported must be registered. 26 U.S.C. § 5841.  The NFA also required that each maker "of a firearm shall, prior to . . . making . . . a firearm, obtain authorization in such manner as required by this chapter."  *Id.*

Under the NFA, a "machinegun" is defined as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," or various parts thereof (including "any combination of parts from which a machinegun can be assembled").  26 U.S.C. § 5845(b). Before a machine gun or other NFA weapon may be made, the maker must: (1) file "a written application . . . to make and register the firearm"; (2) pay "any tax payable"; (3) "identif[y] the firearm to be made"; (4) "identif[y] himself in the application form"; and (5) obtain the approval of ATF "to make and register the firearm" with the firearm "application form show[ing] such approval."  *Id.* § 5822.  That section, and ATF's implementing regulation, 27 C.F.R. § 479.65, provides that an application to make a firearm shall not be approved by ATF if the making or

---

items that would not ordinarily be considered "firearms," such as silencers, rockets, and grenades.  Thus, as a general matter, standard-length shotguns and rifles, and handguns without automatic capabilities, are not "firearms" within the NFA's definition.  *See United States v. Dunn*, 946 F.2d 615, 621 (9th Cir. 1991) (noting that Congress has found weapons classified by the NFA as firearms "to be inherently dangerous and generally lacking usefulness, except for violent and criminal purposes").

[3] Consistent with these taxing provisions, Congress passed the NFA pursuant to its taxation powers, and the NFA is contained in the Internal Revenue Code ("Revenue Code").

possession of the firearm "would place the person making the firearm in violation of law,"

including in violation of the provisions of the NFA.  *See* 27 C.F.R. § 479.65; 26 U.S.C.

§ 5861(f).

In 1968, Congress enacted additional federal legislation regulating firearms, passing the

more far-reaching Omnibus Crime Control and Safe Streets Act ("Omnibus Act"), Pub. L. No.

90-351, 82 Stat. 197 (1968), based on its findings of an extensive interstate commerce in

firearms and the need for adequate federal control over such traffic.  Shortly thereafter, Congress

passed the GCA, intended to "regulate more effectively interstate commerce in firearms" to

reduce crime and misuse, "assist the States and their political subdivisions to enforce their

firearms control laws," and "help combat . . . the incidence of serious crime."  S. Rep. No. 89-

1866, at 1 (1966) (attached as Ex. 2); *see* 18 U.S.C. § 921 *et seq.*  The GCA supplanted prior

firearms regulations, including the Federal Firearms Act of 1938, which was likewise passed

under the Commerce Clause.  *See* Pub. L. No. 75-785, 52 Stat. 1250 (1938) (repealed 1968).

In 1986, Congress again turned its attention to firearms, examining, *inter alia*, the

hazards of machine guns and the desirability of their control.  *See* H.R. Rep. No. 99-495, at 2, 7

(1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1328, 1333 (describing proposed machine gun

restrictions as "benefits for law enforcement" and citing "the need for more effective protection

of law enforcement officers from the proliferation of machine guns"); *id.* at 4, 1986

U.S.C.C.A.N. at 1330 (describing machine guns as "used by racketeers and drug traffickers for

intimidation, murder and protection of drugs and the proceeds of crime"); *see also* 132 Cong.

Rec. 9,602 (1986) (statement of Sen. Kennedy) ("The only thing that has changed about the

machine gun situation since the 1968 act . . . is that machine guns have become a far more

serious law enforcement problem.") (attached as Ex. 3).  Congress therefore enacted the Firearms

4

Owners' Protection Act of 1986 ("FOPA"), Pub. L. No. 99-308, 100 Stat. 449, intended "to strengthen the [GCA] to enhance the ability of law enforcement to fight violent crime and narcotics trafficking."  H. R. Rep. No. 99-495, at 1, 1986 U.S.C.C.A.N. 1327.   Among its provisions, FOPA added 18 U.S.C. § 922(o) to the GCA.  Section 922(o)(1) makes it "unlawful for any person to transfer or possess a machinegun," subject to the following exceptions:

> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(o)(2).  The GCA defines the term "machinegun" by incorporating the NFA's definition of the term.  *See id*. § 921(a)(23).[4]

The circumstances that give rise to this litigation arise in part from different definitions of the term "person" employed by the NFA and GCA.  In the latter statute, "person" is specifically defined to "include any individual, corporation, company, association, firm, partnership, society, or joint stock company."  18 U.S.C. § 921(a)(1).  Because the NFA does not specifically define the term "person," the general definition in the Revenue Code controls: "an individual, *trust*, estate, partnership, association, company, or corporation."  26 U.S.C. § 7701(a)(1) (emphasis added).  The definition of "person" under the NFA therefore includes "trusts," while the GCA definition does not include this term.

---

[4] As Plaintiff observes, the legislative history of the specific amendment that added § 922(o) is limited.  *See* Compl. ¶ 19.  Because "§ 922(o) is closely intertwined with other federal gun legislation," however, the Courts of Appeals "have referred to legislative history not only of § 922(o) itself, but also of other federal gun legislation generally," finding that Congress need not "rearticulate its old findings every time it adds an additional provision." *United States v. Haney*, 264 F.3d 1161, 1169 n.3 (10th Cir. 2001); *see generally* David T. Hardy*, The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585, 589-605 (1987).

## FACTUAL BACKGROUND

As noted in the Complaint, in a March 17, 2014 letter, ATF advised a federal firearms licensee ("FFL") that while the GCA contains an exemption that permits a licensee to forego a NICS check on a previously approved NFA transfer, this exemption does not apply when the transferee is an unincorporated trust.  *See* Complaint ¶ 29 & Ex. A, at 20-22, ECF No. 1.[5]  As ATF's letter explained:

> Because unincorporated trusts are not "persons" under the GCA, a Federal firearms licensee (FFL) cannot transfer firearms to them without complying with the GCA.  Thus, when an FFL transfers an NFA firearm to a trustee or other person acting on behalf of a trust, the transfer is made to this person as an individual (i.e., not as a trust).  As the trustee or other person acting on behalf of the trust is not the approved transferee under the NFA, [26] U.S.C. 5812, the trustee or other person acting on behalf of a trust must undergo a NICS check.  The individual must also be a resident of the same State as the FFL when receiving the firearm.

*Id.*, Ex. A, at 22.  Plaintiff submitted to ATF an Application to Make and Register a Firearm, ATF Form 1 (5320.1) on June 24, 2014, apparently believing that, notwithstanding the March 17, 2014 letter, ATF would approve such applications if made by the trustee of an unincorporated trust.[6]  Compl. ¶ 38.  On August 5, 2014, an ATF examiner mistakenly approved Plaintiff's application.  *Id.* ¶ 39.  A few weeks later, ATF contacted Plaintiff and informed him that the approval had been a mistake and that the status of the inadvertently approved application had been changed to "Disapproved."  *Id.* ¶ 41.  ATF subsequently learned that Plaintiff had manufactured a machine gun shortly after his application was erroneously approved, and instructed Plaintiff that he should

---

[5] Although Plaintiff's pleadings reference the March 17, 2014 letter, directed to FFL Dakota Silencer, he has not described any relationship with Dakota Silencer in either the pleadings or in his submissions to ATF.

[6] Plaintiff also submitted a Form 1 application to make a machine gun on May 23, 2014.  Compl. ¶ 37. The application was returned to him as "Disapproved," accompanied by a letter from William J. Boyle, Chief of the National Firearms Branch of ATF, explaining the reasons for its disapproval.  Compl. ¶ 43, Ex. C & D.

make arrangements to surrender the machine gun to an ATF agent.  *Id.* ¶¶ 40, 48-51.  On November 14, 2014, Plaintiff complied with these instructions and turned the machine gun he had manufactured over to ATF, which provided a receipt confirming that the surrender was due to ATF's "erroneous approval" of Plaintiff's application.  *Id.* ¶ 52; Ex. F.  This lawsuit ensued.

## STANDARD OF REVIEW

Defendants move for dismissal under Rule 12(b)(1) and 12(b)(6).  Under Rule 12(b)(1), "a court must dismiss a complaint if it lacks subject matter jurisdiction over the claims because without subject matter jurisdiction the court does not have the power to hear the case."  *Askew v. Trustees of the General Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc.*, 776 F. Supp. 2d 25, 28 (E.D. Pa. 2011) (*citing Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).  Where, as here, a 12(b)(1) motion "attack[s] the existence of subject matter jurisdiction as a matter of fact," it is the plaintiff that has "the burden of proof that jurisdiction does in fact exist."  *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen*, 549 F.2d at 891). Because "federal courts are courts of limited jurisdiction," the Court should address the existence of subject matter jurisdiction "preliminary to consideration of the merits."  *Employers Ins. of Wausau v. Crown Cork & Seal Co.*, 905 F.2d 42, 45 (3d Cir. 1990) (internal quotations omitted).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted).  A complaint does not satisfy this standard "if it tenders naked assertions devoid of further factual enhancement."  *Id.* (internal citations and punctuation omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007) ("Factual allegations must be enough to raise a right of relief above the speculative level.").  Where claims can be dismissed for both lack of subject-matter jurisdiction and failure to state a claim, the court should dismiss the claims only on the jurisdictional grounds, without reaching the merits.  *See Society Hill Towers Owners Ass'n v. Rendell*, 210 F.3d 168, 175 (3d Cir. 2000); *Nagy v. St. Luke's Hosp.*, No. 1301588, 2014 WL 1327916 at *5 (E.D. Pa. 2014).

Defendants move in the alternative for summary judgment.  A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the nonmovant, the nonmoving party must produce specific facts to demonstrate that a genuine issue exists for trial.  *See Saldana v. Kmart Corp*., 260 F.3d 228, 232 (3d Cir. 2001).

### ARGUMENT

I.    **The Court Should Dismiss Plaintiff's Second Amendment and Commerce Clause Claims for Lack of Subject Matter Jurisdiction Because Plaintiff Fails to Satisfy the Traceability and Redressability Requirements for Standing.**

Article III of the Constitution confines the federal courts to deciding actual "cases" and "controversies."  U.S. Const., art. III, § 2; *Allen v. Wright*, 468 U.S. 737, 750 (1984). "[S]tanding is 'perhaps the most important' of jurisdictional doctrines," determining "the propriety of judicial intervention."  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 280 (3d Cir. 2014) (*quoting Public Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997)); *Pennsylvania Prison Soc'y. v. Cortes*, 508 F.3d 156, 158 (3d Cir.

8

2007).  "It is well established that plaintiffs bear the burden of demonstrating that they have

standing," *Blunt*, 767 F.3d at 278, and "a plaintiff who raises multiple causes of action 'must

demonstrate standing for each claim he seeks to press.'"  *In re Schering Plough Corp.*, 678 F.3d

235, 245 (3d Cir. 2012) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).  A

court's examination of standing should be "especially rigorous when reaching the merits of the

dispute would force [the court] to decide whether an action taken by one of the other two

branches of the Federal Government was unconstitutional."  *Clapper v. Amnesty Int'l*, 133 S. Ct.

1138, 1147 (2013) (internal quotations omitted).  To establish standing, a plaintiff must show

"three elements: (1) the invasion of a concrete and particularized legally protected interest and

resulting injury in fact that is actual or imminent, not conjectural or hypothetical; (2) a causal

connection between the injury and the conduct complained of, meaning that the injury must be

fairly traceable to the challenged action of the defendant; and (3) [that it is] likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision."  *Blunt*, 767 F.3d at

278.

Pennsylvania law prohibits the possession of machine guns.  *See* Title 18 Pennsylvania

C.S.A. § 908(a) ("Prohibited offensive weapons") ("A person commits a misdemeanor of the

first degree if, except as authorized by law, he . . .  possesses any offensive weapon"); *id.*

§ 908(c) (defining "offensive weapon" to include a "machine gun").  Because Pennsylvania law

independently bars his possession of a machine gun, Plaintiff cannot show that any alleged harm

is caused by the NFA and GCA provisions that likewise prohibit him from making or acquiring a

"machinegun," and it is injury from these federal provisions that is identified as the source of

Plaintiff's Commerce Clause and Second Amendment claims.

In analyzing traceability, courts must determine whether "the line of causation between

the illegal conduct and injury [is] too attenuated." *Allen*, 468 U.S. at 753, n.19.  As relevant here, both Federal and Pennsylvania law prohibit individuals from possessing machine guns. The State law prohibition on the possession of machine guns undercuts the argument that Plaintiff's alleged Second Amendment and Commerce Clause injury is traceable to federal law and not "th[e] result [of] the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010) (state bans on cockfighting preclude traceability and redressability in challenge to federal cockfighting ban); *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) (existence of State law banning conduct similar to conduct addressed by a federal law undermined traceability).

Similarly, because Plaintiff does not challenge the Pennsylvania prohibition on machine gun possession, Plaintiff cannot show that granting his requested declaratory relief and invalidating the challenged federal laws are likely to redress his alleged Second Amendment and Commerce Clause injury.  The "limitations imposed by [state law] . . . would remain unchanged," and so a ruling in Plaintiff's favor "would not redress [his] alleged injury, and [he] accordingly lack[s] standing." [7]  *McConnell v. FEC*, 540 U.S. 93, 229 (2003); *see Coastal Outdoor Adver. Grp., LLC, v. Twp. of E. Hanover, NJ*, 397 F. App'x 794, 795 (3d Cir. 2010) (no redressability where unchallenged laws would mandate same outcome as challenged law); *KH Outdoor, L.L.C. v. Clay Cnty.*, 482 F.3d 1299, 1301 (11th Cir. 2007) (similar).

---

[7] Pennsylvania law provides that "[i]t is a defense . . . for the defendant to prove . . . that, with the exception of a bomb, grenade or incendiary device, he complied with the National Firearms Act (26 U.S.C. § 5801 et seq.)."  18 Pa.C.S. § 908(b)(1).  Because Plaintiff's Second Amendment and Commerce Clause claims seek to invalidate the regulation of machine guns under the NFA, the availability of the safe harbor defense in Section 908(b) does not affect the standing analysis for these claims because, should Plaintiff succeed on the claims, there would be no NFA regulation available for him to comply with, leaving him subject to the Pennsylvania prohibition.

Because Plaintiff has failed to satisfy the traceability and redressability requirements of Article III standing, the Court should dismiss Plaintiff's Second Amendment and Commerce Clause claims for lack of subject matter jurisdiction.

**II.     The Court Should Dismiss Plaintiff's Claims for Failure to State a Claim.**

      **A.     The Challenged Laws Are Consistent with the Second Amendment.**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.  In *Heller*, after determining that the Second Amendment conferred an individual right to keep and bear arms, 554 U.S. at 595, the Supreme Court held that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635.  The Court emphasized that the "right secured by the Second Amendment is not unlimited." *Id*. at 626.

*Heller* also articulated a non-exclusive list of what the Court viewed as permissible government regulation of firearms:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.  For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.  Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.
>
> We also recognize another important limitation on the right to keep and carry arms.  [*United States v. Miller*, 307 U.S. 174 (1939)] said, as we have explained, that the sorts of weapons protected were those "in common use at the

time."  We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "*dangerous and unusual weapons*."

*Id.* at 626 (emphasis added) (internal citations omitted).[8]  The Third Circuit has interpeted this list of "categorical exceptions to the Second Amendment" as a binding description of matters "falling outside the scope of the Second Amendment's guarantee."  *United States v. Barton*, 633 F.3d 168, 171-72 (3d Cir. 2011) (internal quotations and alterations omitted).

The Third Circuit has adopted a two-step framework for analyzing firearms restrictions challenged on Second Amendment grounds:

> First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.  If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid.

*United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (internal citations omitted); *see also Drake v. Filko*, 724 F.3d 426, 429 (3d Cir. 2013) (same).  At the first step, courts look both to the list of "presumptively lawful . . . exceptions to the right to bear arms" enumerated in *Heller*, *see Marzzarella*, 614 F.3d at 91, and the historical traditions of the regulation of that right.  *See Drake*, 724 F.3d at 432-34.  Where a regulation "does not burden conduct within the scope of the Second Amendment's guarantee . . . [the Court] need not move to the second step."  *Id.* at 429-30.  On the other hand, if the law does burden conduct within the Second Amendment's scope, the Court must consider whether it "withstands the applicable intermediate level of scrutiny."  *Id.*

Here, the Court's inquiry can end at Step One because the challenged federal laws do not restrict the possession of weapons protected by the Second Amendment; accordingly, these laws do not impose any burden, let alone a substantial burden, on conduct historically protected by the Second Amendment.  But even if the Court were to analyze the challenged laws under

---

[8] *Heller* specifically noted that the "presumptively lawful regulatory measures" it identified were merely "examples," and that the list "does not purport to be exhaustive."  *Heller*, 554 U.S. at 627 n.26.

heightened constitutional scrutiny, these laws readily pass muster under intermediate scrutiny,

the appropriate level of review for laws that do not implicate "the core of the [Second]

Amendment," *Drake*, 724 F.3d at 436, *i.e.*, "the right of law-abiding, responsible citizens to use

arms in defense of hearth and home."  *Heller*, 554 U.S. at 635.  Accordingly, the Court should

dismiss Plaintiff's claims or enter summary judgment for Defendants.

> **1.    The Challenged Laws Do Not Burden Conduct Protected by the
> Second Amendment.**

>> **a.    The Second Amendment Does Not Protect an Individual Right
>> to Possess Machine Guns.**

As the Supreme Court and the Third Circuit have recognized, "[a]lthough the individual

right to keep and bear arms is fundamental, it is 'not unlimited.'"  *Barton*, 633 F.3d at 171

(*quoting Heller*, 554 U.S. at 626).  The various liberties secured by the Bill of Rights "ha[ve],

from time immemorial, been subject to certain well-recognized exceptions, arising from the

necessities of the case."  *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897).  The Second

Amendment, properly construed, allows for reasonable regulation of firearms, particularly

applied in light of context and history and the unquestionable threat to public safety that

unrestricted private weapons possession would entail.  For this reason, *Heller* emphasized the

importance of "the historical tradition of prohibiting the carrying of 'dangerous and unusual

weapons'" in defining this limitation on the Second Amendment right, even to the extent that the

Second Amendment would not prevent a ban on the "weapons that are most useful in military

service – M-16 rifles and the like . . . ." *Heller*, 554 U.S. at 627; *id.* at 627-28 (noting that "the

conception of the militia at the time of the Second Amendment's ratification was the body of all

citizens capable of military service, who would bring the sorts of lawful weapons that they

possessed at home to militia duty," and explaining that the possibility that "no amount of small

13

arms could be useful against modern-day bombers and tanks . . . cannot change our interpretation

of the right").

In addition, although the Court did not purport to define the full scope of the Second

Amendment right in *Heller*, the Court did examine *Miller*, which had "upheld against a Second

Amendment challenge two men's federal indictment for transporting an unregistered short-

barreled shotgun in interstate commerce, in violation of the National Firearms Act."  *Heller*, 554

U.S. at 621-22 (citation omitted).  *Heller* explained that "the Court's basis for saying that the

Second Amendment did not apply" in *Miller*:

> was that the *type of weapon at issue* was not eligible for Second Amendment protection:
> "In the absence of any evidence tending to show that the possession or use of a [short-
> barreled shotgun] at this time has some reasonable relationship to the preservation or
> efficiency of a well regulated militia, we cannot say that the Second Amendment
> guarantees the right to keep and bear *such an instrument*.  "Certainly," the Court
> continued, "it is not within judicial notice that this weapon is any part of the ordinary
> military equipment or that its use could contribute to the common defense."

*Id*. at 622 (quoting *Miller*, 307 U.S. at 178) (emphasis in *Heller*).  Of particular importance to the

present case, the *Heller* Court further stated:

> We may as well consider at this point (for we will have to consider eventually) what
> types of weapons *Miller* permits.  Read in isolation, *Miller*'s phrase "part of ordinary
> military equipment" could mean that only those weapons useful in warfare are protected.
> *That would be a startling reading of the opinion*, *since it would mean that the National
> Firearms Act's restrictions on machineguns* (not challenged in *Miller*) *might be
> unconstitutional*, machineguns being useful in warfare in 1939.  We think that *Miller*'s
> "ordinary military equipment" language must be read in tandem with what comes after:
> "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear
> bearing arms supplied by themselves and of the kind in common use at the time."  The
> traditional militia was formed from a pool of men bringing arms "in common use at the
> time" for lawful purposes like self-defense.  "In the colonial and revolutionary war era,
> [small-arms] weapons used by militiamen and weapons used in defense of person and
> home were one and the same."  Indeed, that is precisely the way in which the Second
> Amendment's operative clause furthers the purpose announced in its preface. We
> therefore read *Miller* to say only that the Second Amendment does not protect those
> weapons not typically possessed by law-abiding citizens for lawful purposes, such as
> short-barreled shotguns.

14

*Id.* at 624-25 (internal citations omitted) (emphasis added).  *Heller* thus explicitly recognized an

"important limitation on *the right* to keep and carry arms . . . the sorts of weapons protected [are]

those 'in common use at the time.'"  *Id.* at 627 (*quoting Miller*, 307 U.S. at 179) (emphasis

added).  Additionally, *Heller*'s description as "startling" of any conclusion that "the National

Firearms Act's restrictions on machineguns [] might be unconstitutional, machineguns being

useful in warfare in 1939" strongly indicates that machine guns are outside the scope of the

individual right protected by the Second Amendment.  *Id.* at 624.

      Consistent with the view expressed in *Heller*, the Third Circuit and every other federal

circuit to subsequently address the issue has determined there is no Second Amendment right to

possess a machine gun.  In *Marzzarella*, the Third Circuit stated that "the Second Amendment

affords no protection for the possession of dangerous and unusual weapons," and opined that

"machine guns and short-barreled shotguns" should be classified as dangerous and unusual.  614

F.3d at 92, 94.  Similarly, in *United States v. Henry*, 688 F.3d 637 (9th Cir. 2012), the Ninth

Circuit concluded that "machine guns are 'dangerous and unusual weapons' . . . not protected by

the Second Amendment," because "[s]hort of bombs, missiles, and biochemical agents, . . . few

weapons [] are more dangerous."  *Id.* at 640; *see also United States v. McCartney*, 357 F. App'x

73, 76 (9th Cir. 2009) ("[T]he possession of a machine gun by a private citizen is quite unusual

in the United States").  The Eighth Circuit likewise considered the application of *Heller* to the

NFA and GCA's regulation of machine guns and concluded that Second Amendment protections

do not apply because machine guns are "not in common use by law-abiding citizens for lawful

purposes and therefore fall within the category of dangerous and unusual weapons that the

government can prohibit for individual use."  *United States v. Fincher*, 538 F.3d 868, 874 (8th

Cir. 2008); *accord Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009) (holding that the Second Amendment does not protect a right to possess unregistered machine guns).[9]

Both the text of the Second Amendment and Founding-era laws also strongly indicate that the Amendment does not foreclose categorical legislative prohibitions on classes of "Arms," including machine guns. Rather, the right protected by the Second Amendment is a right to "keep and bear Arms," not a right to possess a specific firearm or type of firearm. U.S. Const., amend. II.; *see Heller*, 554 U.S. at 627; *Marzzarella*, 614 F.3d at 94-95. Founding-era militia members were expected to procure their own firearms and to bring those guns when called to service. *See Miller*, 307 U.S. at 179. The militia could not have been "well regulated" if individuals had unrestricted freedom to choose which "Arms" they would possess. Rather, it was essential to the effective operation of the militia as then constituted that government officials be authorized to specify the weapons that individual members would be required to procure and maintain.[10] The Second Amendment's text and history thus suggest that the substantive right secured did not guarantee an unfettered *choice* of "Arms."

Contemporaneous evidence of the Framers' views regarding the scope of the right strongly reinforces this inference. The Second Militia Act prescribed in substantial detail the

---

[9] Indeed, even scholars who urge a broad reading of the Second Amendment right concede that the Supreme Court's opinion in Heller, reinforced by the text and history of the Second Amendment, are sufficient on their own to preclude Plaintiff's Second Amendment claims. *See* David B. Kopel, *The First Amendment Guide to the Second Amendment*, 81 Tenn. L. Rev. 417, 435 (2014) (applying two-step analysis to conclude that "the court's Second Amendment inquiry would end . . . for machine guns" at step one, because "Heller says [they] are not Second Amendment 'arms.'").

[10] Many Founding-era laws accordingly specify types of weapons to be maintained by those enrolled in the militia. *See, e.g.*, 1786 N.C. Sess. Laws 407, ch. 1, § 5 ("[E]very able bodied man who shall be enlisted . . . shall furnish himself with one good rifled or smooth bored gun fit for service); 1786 Va. Acts 407-08 (requiring that "every non-commissioned officer and private [have] a good, clean musket carrying an ounce ball, and three feet eight inches long in the barrel, with a good bayonet"); 1836 Ohio Laws 30, § 29 ("[F]ield officers shall each arm himself with a good and sufficient sword and pair of pistols . . . and in the artillery each private or matross shall be armed with a good and sufficient musket") (attached as Ex. 4).

types and categories of firearms (as well as ammunition) that different classes of militia members were to procure and bring when called to service:

> That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch, with a box therein, to contain not less than twenty four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch, and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred and provided, when called out to exercise, or into service, except, that when called out on company days to exercise only, he may appear without a knapsack. That the commissioned [O]fficers shall severally be armed with a sword or hanger and espontoon, and that from and after five years from the passing of this act, all muskets from arming the militia as is herein required, shall be of bores sufficient for balls of the eighteenth part of a pound.

Second Militia Act, § 1, 1 Stat. 271-72 (1792).  Congress's enactment of this Act confirms that the Framers did not understand the right secured by the Second Amendment to include unrestricted freedom of choice among "Arms," as the Court of Appeals correctly concluded in *Marzzarella*.  614 F.3d at 94.

### b.     Restrictions on the Possession of Machine Guns Are Longstanding and Presumptively Lawful.

The Third Circuit in *Marzzarella* concluded that *Heller*'s list of "presumptively lawful regulatory measures," constitute exceptions to the Second Amendment right that require resolution of Plaintiff's claim at Step One.  *See* 614 F.3d at 91 (*quoting* 554 U.S. at 627 n.26) ("The "presumptively lawful" list of "longstanding limitations are exceptions to the right to bear arms").  The Court of Appeals explained that it is therefore "clear that restrictions on the possession of dangerous and unusual weapons are not constitutionally suspect because these weapons are outside the ambit of the amendment."  *Id.  See also United States v. Huet*, 665 F.3d 588, 600 (3d Cir. 2012) ("[T]he longstanding limitations mentioned by the Court in *Heller* are exceptions to the right to bear arms.").  "In addition," as the Court of Appeals explained in

*Drake*, "a firearms regulation may be 'longstanding' and 'presumptively lawful' even if it was only first enacted in the 20th century. . . . After all, *Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid-twentieth century vintage."  724 F.3d at 434 n. 11 (quoting *Nat'l Rifle Ass'n* ("*NRA*") *v. ATF*, 700 F.3d 185, 196-97 (5th Cir. 2012)).  *See also Heller v. Dist. of Columbia* ("*Heller II*"), 670 F.3d 1244, 1253 (D.C. Cir. 2011) (the Supreme Court "considered prohibitions on the possession of firearms by felons to be 'longstanding' although states did not start to enact them until the early 20th century") (internal quotations and citations omitted).[11]

Longstanding State restrictions on the purchase or possession of machine guns demonstrate that bans on fully-automatic weapons are "derived from historical regulations." *Drake*, 724 F.3d at 432.  As the Superior Court of Pennsylvania explained nearly four decades ago, a machine gun is one of a "class of weapons [which] have no peaceful purpose, and their only conceivable use is for purposes which our society has found to be criminal . . . the legislature has clearly stated that [it is] an 'implement for the infliction of serious bodily injury which serves no common lawful purpose.'"  *Commonwealth v. Ponds*, 236 Pa. Super. 107, 110-11, 345 A.2d 253, 254-55 (1975) (discussing and quoting 18 Pa.C.S.A. § 908, the state prohibition on "offensive weapon[s]," including "any bomb, grenade, [or] machine-gun").  Between the invention of practical automatic weapons in the late nineteenth century and 1934, the year the NFA was enacted, at least twenty-one States enacted their own laws restricting the

---

[11] The twentieth-century history of regulating machine guns is appropriately considered "longstanding" in light of the short history of functional automatic weapons.  An American inventor residing abroad "demonstrated the first successful automatic weapon in 1884."  David B. Kopel *et al.*, *A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts*, 68 Temp. L. Rev. 1177, 1200 (1995).  Although their principles had been envisioned earlier, even the crank-operated or multi-barreled predecessor machine guns, such as the Gatling gun and the Ager Gun, became "practical" only during the Civil War and the era afterwards.  *Id.* at 1195, 1200; *see also* Frank Hobart, *Pictorial History of the Machine Gun* at 11-22 (1971).

acquisition, possession, or sale of machine guns.[12]  And nine of those twenty-one States had

Second Amendment analogues in their respective State constitutions when they enacted the

statutes at issue.[13]  *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11

Tex. Rev. L. & Pol. 191 (2006); *cf. NRA*, 700 F.3d at 202 nn.14 & 15 (discussing States with

longstanding restrictions on the purchase or use of particular firearms by persons under 21 that

had State constitutional analogues to the Second Amendment at the time they enacted these

restrictions).  These longstanding State laws restricting the possession of machine guns confirm

that such weapons are "not constitutionally suspect because these weapons are outside the ambit

of the amendment."  *Marzzarella*, 614 F.3d at 91; *see also Morrison v. State*, 339 S.W. 2d 529,

531-32 (Tex. Crim. App. 1960) (finding that "[a] machine gun is not a weapon commonly kept

 . . . and appropriate for open and manly use in self defense," and holding that "the statute

making it unlawful to possess a machine gun is not violative of the constitutional right of every

citizen to keep and bear arms in the lawful defense of himself or the state.").

　　　　Historical State restrictions likewise demonstrate that, contrary to Plaintiff's supposition,

*see* Compl. at ¶ 27, laws prohibiting an entire class of weapons as dangerous or unusual are not

anomalous.  Several States banned the possession or sale of classes of guns and knives in the

---

[12] *See* 1931 Ark. Acts 705 (unlawful to keep, transport, store, possess, sell, or give away any machine gun); 1927 Cal. Stat. 938 (prohibiting possession of machine guns); 37 Del. Laws 813 (1931) (possession of machine guns prohibited); 1931 Ill. Laws 452-54 (prohibiting selling, loaning, purchasing, possessing, or carrying a machine gun); 1927 Ind. Acts 469 (ban on ownership, possession, or controlling a machine gun in an automobile); 1927 Iowa Acts 201 (possession or control of machine gun prohibited); 1933 Kan. Sess. Laws 76 [Special Session] (transport, possession); 1932 La. Acts 337 (unlawful to sell, keep, offer for sale, loan, purchase, possess, carry, or transport a machine gun); 1927 Mich. Pub. Acts 888-89 (manufacture, sale, or possession of machine gun prohibited); 1933 Minn. Laws 232-33 (ownership, control, use, possession, sale, or transport); 1929 Mo. Laws 170 (sale, transport, possession, or control); 1929 Neb. Laws 674 (sale, transfer, transport, possession); 1927 N.J. Laws 180-81 (sale, transfer, possession); 1931 N.Y. Laws 2389-90 (possession or use); 1931 N.D. Laws 305-06 (sale or possession of machine gun caliber larger than .22); 1929 Pa. Laws 777-78 (sale, transfer, ownership, possession); 1927 R.I. Acts & Resolves 256-59 (manufacture, sale, purchase, possession); 1934 S.C. Acts 1288-89 (transport, storage, possession, sale, transfer); 1933 Tex. Gen. Laws 219-20 (possession or use); 1933 Wash. Sess. Laws 335-36 (manufacture, ownership, purchase, sale, transfer, transport, possession); 1929 Wis. Sess. Laws 157 (ownership, use, possession), attached as Ex. 5.

[13] Arkansas, Delaware, Indiana, Kansas, Pennsylvania, Rhode Island, South Carolina, Texas, and Washington.

early nineteenth century.  *See, e.g.*, Act of Dec. 25, 1837, 1837 Ga. Laws 90. § 1 (prohibiting

classes of knives, pistols, and other dangerous weapons); Act of Jan. 27, 1838, 1837-1838 Tenn.

Pub. Acts 200, ch. 137 (banning sale of categories of knives).[14]  This historical practice

continued after the Civil War and passage of the Fourteenth Amendment.  *See, e.g.*, Illinois Act

of Apr. 16, 1881, § 1, 1881 Ill. Laws 73 (barring possession or transfer of "any slung-shot or

metallic knuckles, or other deadly weapon of like character"); Act of May 20, 1929 Sec. 3, 1929

Mich. Pub. Acts 529 (making it "unlawful . . . to manufacture, sell, offer for sale, or possess any

machine gun or firearm which can be fired more than sixteen (16) times without reloading");[15]

Ark. Act of Apr. 1, 1881, § 1 (banning sale or transfer of "any pistol of any kind whatever,

except such pistols as are used in the army or navy"); Tenn. Act of Mar. 14, 1879, 1879 Tenn.

Pub. Acts 135, chap. 96, § 1 ("An Act to Prevent the Sale of Pistols"); N.Y. Act of Apr. 15,

1889, 1889 N.Y. Laws 167 (prohibiting possession of "a slungshot, billy, sand-club or metal

knuckles") (attached as Ex. 6).  As demonstrated by this variety of historical examples, there is

nothing foreign to the Second Amendment in the prohibition of particularly dangerous categories

of weapons.  *See Heller*, 554 U.S. at 627.

---

[14] At the time Tennessee adopted its categorical restriction on classes of knives, the Tennessee Constitution contained a Second Amendment analogue.  *See* Tenn. Const. of 1834, art. I, § 26 (guaranteeing "[t]hat the free white men of this State have a right to keep and to bear arms for their common defence").  On review of a state constitutional challenge to a conviction under this statute, the Supreme Court of Tennessee affirmed the conviction, rejecting the view that this provision permitted the defendant to "arm himself in any manner he may choose, however unusual or dangerous the weapons he may employ."  *See Aymette v. State*, 21 Tenn. 154, 156, 1840 WL 1554 at *1 (1840).  *But see Nunn v. State*, 1 Ga. 243, 251, 1846 WL 1167 (Ga. 1846) (reversing conviction under the 1837 Georgia statute, holding "so much of it, as contains a prohibition against bearing arms openly, is in conflict with the [U.S.] Constitution").

[15] The Supreme Court of Michigan affirmed this statute against a challenge under the state constitutional provision guaranteeing that "[e]very person has a right to bear arms for the defense of himself and the state," Mich. Const. of 1835, art. 1, § 13.  *See People v. Brown*, 253 Mich. 537 (Mich. 1931).

### 1.    Because Any Burden Imposed by the Challenged Federal Laws Is Minimal, No Heightened Constitutional Scrutiny Is Warranted.

Even if the Court were to find that the challenged laws burden constitutionally-protected conduct, it need not engage in heightened constitutional scrutiny because any such burden is *de minimis*. "[N]ot every limitation or incidental burden on the exercise of" a constitutionally protected right "is subject to a stringent standard of review." *Bullock v. Carter*, 405 U.S. 134, 143 (1972) (citing *McDonald v. Bd. of Elections Comm'rs*, 394 U.S. 802 (1969)). As the Supreme Court has explained, "it is essential to examine in a realistic light the extent and nature" of any supposed restriction on protected rights. *Id.* In doing so, the Supreme Court frequently declines to employ elevated constitutional scrutiny to analyze regulations that do not impose a "substantial" or "significant" burden on a constitutional right. *See, e.g., Zablocki v. Redhail*, 434 U.S. 374, 386, 391 (1978) ("[R]easonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed."); *Glickman v. Wileman Bros. & Elliott, Inc.,* 521 U.S. 457, 470 (1997) ("The First Amendment has never been construed to require heightened scrutiny of any financial burden that has the incidental effect of constraining the size of a firm's advertising budget.").

As the Third Circuit described in *Marzzarella*, "the Second Amendment can trigger more than one particular standard of scrutiny." 614 F.3d at 97. The Court of Appeals analogized its review to First Amendment doctrines, explaining that there is "no reason why the Second Amendment would be any different" and that laws burdening Second Amendment rights are therefore "susceptible to several standards of scrutiny, depending upon the type of law challenged." *Id.* at 96-97. Adopting this reasoning, the Second Circuit recently explained in *United States v. Decastro* that, "[g]iven *Heller*'s emphasis on the weight of the burden imposed by the D.C. gun laws, we do not read the case to mandate that any marginal, incremental or even

appreciable restraint on the right to keep and bear arms be subject to heightened scrutiny." 682 F.3d 160, 166 (2d Cir. 2012), *cert. denied*., 133 S. Ct. 838 (2013).   In *Decastro*, the Second Circuit thus concluded that "heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)." *Id. Accord Heller II*, 670 F.3d at 1253, 1255, 1260 (laws that have only a "*de minimis*" effect on the right to bear arms or that do not "meaningfully affect individual self-defense" do not impinge on the Second Amendment right and therefore do not warrant heightened scrutiny) (internal citations omitted); *Nordyke v. King*, 644 F.3d 776, 786, 787-88 (9th Cir. 2011) (holding that "only regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment" and noting that "a law does not substantially burden a constitutional right simply because it makes the right more expensive or more difficult to exercise"), *superseded by* 681 F.3d 1041, 1044 (9th Cir. 2012) (en banc) (finding ordinance "permissible" under the Second Amendment because it "regulates the sale of firearms at Plaintiffs' gun shows only minimally, and only on County property"); *but see Drake*, 724 F.3d at 436 ("*Heller* makes clear that we may not apply rational basis review to a law that burdens protected Second Amendment conduct.").

Here, the prohibition on machine guns does not impose a substantial burden on the "inherent right of self defense [that] has been central to the Second Amendment right." *Heller*, 554 U.S. at 628; *see infra* pp. 25-26.  Other categories of firearms that are unaffected by machine gun restrictions are likely to be as effective for self-defense purposes, without raising the cost of exercising the right.  *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1487 (2009) ("Machine guns are no more useful for self-

defense than are nonautomatic guns in all but a tiny fraction of civilian uses.") (footnote

omitted); *United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999) (machine guns and

other proscribed weapons "have no appropriate sporting use or use for personal protection"); *cf.*

*Linmark Assocs., Inc., v. Willingboro Twp.*, 431 U.S. 85, 93 (1977) (in First Amendment context,

adequacy of alternatives to proscribed conduct to be evaluated by analyzing relative cost and

effectiveness).  Indeed, handguns, semi-automatic rifles, and shotguns are easier and more

practical to use, carry, store, and drill than machine guns.  *See Heller*, 554 U.S. 570, 636, 710

(Stevens, J., dissenting) (explaining burdens of handgun bans with reference to the fact that

handguns are "easier to hold and control (particularly for persons with physical infirmities),

easier to carry, easier to maneuver in enclosed spaces . . . .").  Although machine guns accord

their operator a high rate of fire, the principal advantage of this feature is to confer the ability to

engage in suppressive fire across a wide area or to engage numerous targets at one time; these

are considerations that seldom, if ever, arise in the personal self-defense context.  *See generally*

Gary Kleck & Marc Gertz, *Armed Resistance to Crime*, 86 J. Crim. L. & Criminology 150

(1995) (explaining that "[i]ncidents where victims use a gun defensively are almost never

gunfights where both parties shoot at one another," and finding that only 3% of defensive

firearms uses involved an exchange of rounds).  For these reasons, as Congress recognized in

adopting the NFA, "while there is justification for permitting the citizen to keep a pistol or

revolver for his own protection without any restriction, there is no reason why anyone except a

law officer should have a machine gun or sawed-off shotgun."  H.R. Rep. No. 73-1780, at 1

(1934) (attached as Ex. 7).  Because other categories of firearms are equally useful – if not more

so – for self-defense than machine guns, the burden on the Second Amendment right is at most

"marginal [and] incremental" and therefore does not warrant significantly heightened scrutiny.

*Decastro*, 682 F.3d at 166; *see also Heller II*, 670 F.3d at 1262 (noting, by analogy to the First Amendment, that challenged firearms laws did "not effectively disarm individuals" because they left open "ample alternative channels" for self-defense).

###### 2.    18 U.S.C. § 922(o) Satisfies Intermediate Scrutiny.

In any case, the challenged provisions readily withstand intermediate scrutiny.[16]  When reviewed under this standard, the statutory limitations imposed "must be substantially related to an important governmental objective."  *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  The Third Circuit has recognized several factors relevant to this analysis.  First, the degree of fit between the challenged law and the governmental interest it serves need only be "reasonable."  *Drake*, 724 F.3d at 436.  Second, "[w]hen reviewing the constitutionality of statutes, courts 'accord substantial deference to the legislature's predictive judgments.'"  *Id.* at 436-37 (quoting *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 195 (1997)) (internal punctuation omitted).  Third, as the Supreme Court has noted, the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments [varies] up or down with the novelty and plausibility of the justification raised."  *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000).

Among the federal firearms statutes, the NFA focuses on regulating "especially dangerous weapons such as machine guns and silencers."  *RSM, Inc. v. Herbert*, 466 F.3d 316, 318 (4th Cir. 2006); *accord United States v. Serna*, 309 F.3d 859, 863 (5th Cir. 2002) (NFA enacted to control weapons "primarily used for violent purposes").  The inclusion of machine guns in the NFA's regulation stems from Congress's "'specific declaration and finding that destructive devices [,] machine guns, [etc.] are primarily weapons of war and have no appropriate sporting use or use for personal protection.'"  *Jennings*, 195 F.3d at 799 n.4 (*quoting*

---

[16] While no more than intermediate scrutiny is appropriate, as explained below, the challenged federal laws would also satisfy strict scrutiny for the reasons set forth below and because they are "presumptively lawful."  *Heller*, 554 U.S. at 527 n.26.

S. Rep. No. 90-1501, at 28 (1968)); *see also United States v. Dunlap*, 209 F.3d 472, 478 n.12 (6th Cir. 2000) ("Congress required registration of these types of weapons because it believed that these weapons, by their very nature, were extremely dangerous and served virtually no purpose other than furtherance of illegal activity.") (emphasis omitted).  This "immense danger posed by machineguns" provides a reasonable rationale for Congress to regulate machine guns. *See United States v. O'Brien*, 560 U.S. 218, 230 (2010) (in sentencing context, recognizing "the moral depravity in choosing" to use a machine gun in criminal activity); *see also Henry*, 688 F.3d at 640 (machine guns can deliver "murderously effective firepower" and their high rate of fire can allow "a shooter to kill dozens of people within a matter of seconds."); Volokh, *Implementing the Right*, 56 UCLA L. Rev. at 1482 ("[m]achine guns are more dangerous in their likely effects than are those guns that are in common use among law-abiding citizens").[17]  The dangers machine guns pose to public safety and to law enforcement officers warrant stringent limitations on the possession and transfer of machine guns in private hands.

Furthermore, machine guns are "peculiarly adaptable to use by criminals in the pursuit of their criminal activities."  *Rinzler v. Carson*, 262 So.2d 666 (Fla. 1972) (upholding firearms seizure under Florida's state prohibition on machine guns, notwithstanding state constitutional

---

[17] The accidental dangers of machine guns are also elevated relative to semiautomatic and other weapons.  Even the most rudimentary firearms-safety instruction emphasizes the importance of muzzle control, the principle that a firearm should never be pointed at anything the bearer is unwilling to shoot.  *See, e.g.*, National Rifle Association ("NRA") Gun Safety Rules, underline(available at) http://training.nra.org/nra-gun-safety-rules.aspx (last accessed Jan. 13, 2015) ("1. ALWAYS keep the gun pointed in a safe direction . . . control where the muzzle or front end of the barrel is pointed at all times."); National Shooting Sports Foundation, *Firearms Safety – 10 Rules of Safe Gun Handling*, underline(available at) http://www.nssf.org/safety/basics/ (last accessed Jan. 13, 2015) ("1. Always Keep the Muzzle Pointed in a Safe Direction").  The recoil and rapidity of fully-automatic firing reduces the ability of a machine gun's bearer to control the muzzle, thereby leading to a broader spread of fire than less-dangerous weapons that are in more common use.  *See* Allen Rostron, *High-Powered Controversy*, 73 U. Cin. L. Rev. 1415 (2005) (contrasting accuracy of sniper rifles to machine guns); Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* at 68-69 (2009) (describing inaccuracy of submachine guns).

right to keep and bear arms); *see also* Prefatory Note, Uniform Machine Gun Act (1932) ("the Thompson submachine gun, with wooden butt-stock removed, using ordinary .45 caliber Colt automatic pistol shells, is now used almost exclusively by criminals in the United States").  As Congress emphasized, these concerns led to passage of the NFA, which had as its "principal purpose . . . to control the traffic in machine guns and sawed-off shotguns, the type of firearms commonly used by the gangster element."  S. Rep. No. 82-1495, at 1 (1952) (attached as Ex. 8); *see also* H.R. Rep. No. 73-1780, at 1 (unanimous report of Ways and Means Committee) ("The gangster as a law violator must be deprived of his most dangerous weapon, the machine gun.") (attached as Ex. 7).  Protecting public safety and combating crime are well-established *compelling* governmental interests.  *See United States v. Salerno*, 481 U.S. 739, 748-50 (1987) (noting that the Supreme Court has "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest" and that the government's "general interest in preventing crime is compelling"); *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted") (citation and internal quotations omitted).  Thus, in light of the dangers posed by machine guns and their particular utility to criminals, there is at least a "reasonable fit" between the challenged federal laws and the government's interest in protecting the public and law enforcement officers from the dangers of automatic firearms and their high rates of fire.  *See Drake*, 724 F.3d at 436.

### B.   Congress Acted Within Its Commerce Power When It Enacted the GCA and FOPA.

Plaintiff asks the Court to declare that, because "machineguns do not pose a substantial effect on interstate commerce, Congress cannot rely on the Commerce Clause to ban machineguns, and therefore Congress had no constitutional authority to enact 18 U.S.C. § 922(o)

or its accompanying regulations."[18]  Compl. ¶ 60.  But the Supreme Court, the Third Circuit, and

other Courts of Appeals that have considered the issue have repeatedly held that even purely

intrastate activities, including the manufacture and transfer of machine guns, do affect interstate

commerce and thus are within Congress' power to regulate.  *See United States v. Rybar*, 103

F.3d 273, 284-85 (3d Cir. 1996) (affirming conviction for possession of a machine gun against

Commerce Clause challenge and observing that "it is telling that each of our sister circuits has

found that the regulation of machine gun transfer and possession comes within Congress' power

to legislate under the Commerce Clause."); *Henry*, 688 F.3d at 641 (similar), *id.* at 641 n.5

(noting that "even if *National Federation of Independent Business* [*v. Sebelius*, 132 S. Ct. 2566

(2012)] changed Supreme Court precedent regarding the Commerce Clause," it would not affect

18 U.S.C. § 922(o).  As a result, there is no basis for Plaintiff's claims regarding the Commerce

Clause.

      In *Gonzales v. Raich*, 545 U.S. 1 (2005), the Supreme Court squarely held that the

Commerce Clause authority included the power to prohibit the local cultivation and use of

marijuana.  The *Raich* Court stated that "case law firmly establishes Congress' power to regulate

purely local activities that are part of an economic 'class of activities' that have a substantial

effect on interstate commerce."  *Id*. at 17 (*citing Wickard v. Filburn*, 317 U.S. 111, 128-29

(1942)).  When "a general regulatory statute bears a substantial relation to commerce, the *de*

---

[18] As noted *supra*, Congress originally acted under its taxation power in regulating machine guns under the NFA.  In *Sonzinsky v. United States*, 300 U.S. 506 (1937), the Supreme Court upheld the NFA based on the taxation power of Congress, and the Third Circuit has affirmed that the "NFA remains a proper exercise of the congressional taxing power under the Constitution."  *United States v. Grier*, 354 F.3d 210, 215 (3d Cir. 2003).  Plaintiff cites a repudiated district court case, *United States v. Rock Island Armory, Inc.*, 773 F. Supp. 117, 119 (C.D. Ill. 1991) to suggest that Section 922(o) impliedly repeals ATF authority over machine guns under the NFA. *Compare* Compl. ¶¶ 34-36 (*citing Rock Island*) *with United States v. Ross*, 9 F.3d 1182, 1192-94 (7th Cir. 1993) (rejecting the rationale of *Rock Island*).  However, the Third Circuit explicitly rejected this view in *Grier*, holding that FOPA and the NFA can be reconciled.  354 F.3d at 214.  *See also United States v. Bournes*, 105 F. Supp. 2d 736, 745 n.3 (E.D. Mich. 2000) ("The Government correctly observes that *Rock Island Armory* can no longer be considered good law, as its reasoning was rejected by the Court of Appeals for the Circuit in which *Rock Island Armory* was decided.") (citing *Ross*).

*minimis* character of individual instances arising under that statute is of no consequence." *Id*. Moreover, courts "need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id*. at 22. For these reasons, the Court held that the prohibition of "the intrastate possession or manufacture of any article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." *Id*. at 26.

The Courts of Appeals have applied *Raich* to uphold the Federal firearms laws, including the restrictions on possession of machine guns. In *United States v. Stewart*, 451 F.3d 1071 (9th Cir. 2006), the defendant was convicted of violating 18 U.S.C. § 922(o), and appealed his conviction by arguing that section 922(o) was an invalid exercise of Congress' commerce power. *Id.* at 1073 . The defendant argued that "his possession falls within a subgroup of purely intrastate activities that can easily be cordoned off from those Congress may constitutionally control." *Id*. at 1074. Citing *Raich*, the Ninth Circuit disagreed and concluded that "[g]uns, like drugs, are regulated by a detailed and comprehensive statutory regime designed to protect individual firearm ownership while supporting 'Federal, State and local law enforcement officials in their fight against crime and violence.'" *Id*. at 1076 (quoting GCA, Pub. L. No. 90-618, § 101, 82 Stat. 1213). As a result, the Ninth Circuit held that Congress had a "rational basis to conclude that federal regulation of intrastate incidents of transfer and possession [of machine guns] is essential to effective control of the interstate incidents of such traffic." *Id.* at 1077. *See also Montana Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 982-83 (9th Cir. 2013) (Congress's commerce power extends to intrastate regulation of firearms manufacture). Numerous other Courts of Appeals have reached similar conclusions. *See United States v. Rose*, 522 F.3d 710, 717-18 (6th Cir. 2008) (applying *Raich* to uphold § 922(d)(1), and finding that

"[g]uns are a fungible commodity for which there is an established interstate market.  Section

922(d)(1) is also part of a larger regulatory framework."); *United States v. Rene E.*, 583 F.3d 8,

18 (1st Cir. 2009) ("[N]othing in . . . *Raich* [or *Heller*] undermines" conclusion that Congress

may regulate intrastate firearms possession under Commerce Clause).

      Moreover, the holding of *Raich* itself applies to Plaintiff's challenge here.  The Court in

*Raich* affirmed the proposition that Congress could "regulate purely intrastate activity," even if

that activity is not undertaken for commercial purposes, as long as "failure to regulate that class

of activity would undercut the regulation of the interstate market." *Raich*, 545 U.S. at 18.  Here,

there can be no doubt that regulating the "intrastate possession or manufacture" of firearms "is a

rational . . . means of regulating commerce in that product." *Id*. at 26.  Congress enacted the

GCA and NFA because it was concerned with keeping firearms "out of the hands of those not

legally entitled to possess them because of age, criminal background, or incompetency, and to

assist law enforcement authorities in the States and their subdivisions in combating the

increasing prevalence of crime in the United States."  S. Rep. No. 90-1097 (1968), *reprinted in*

1968 U.S.C.C.A.N. 2112, 2113-14.  Without the concomitant regulation of intrastate

manufacture, Congress's purpose would likely soon be frustrated by the efforts of 50 intrastate

manufacturers producing machine guns.  Thus, as the Third Circuit has explained, "Congress'

intent to regulate possession and transfer of machine guns as a means of stemming interstate gun

trafficking is manifest." *Rybar*, 103 F.3d at 282 (discussing the findings in the GCA, NFA, and

Omnibus Crime Control Act relating to interstate commerce).  As with the Controlled Substances

Act, the Federal firearms laws constitute "comprehensive legislation to regulate the interstate

market in a fungible commodity." *Raich*, 545 U.S. at 22.[19]

---

[19] Indeed, *Raich*'s affirmance of Congress's Commerce Clause authority to regulate controlled substances is directly
related to Congress's authority to regulate machine guns: as the Third Circuit noted in *Rybar*, Congress explained in

**C.**     **The Challenged Federal Laws Are Consistent with Principles of Due Process.**

"It is elementary that procedural due process is implicated only where someone has claimed that there has been a . . . deprivation of a legally protected . . . property interest." *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998). "Thus, the threshold issue with respect to [Plaintiff's] procedural due process claim is whether there exists a 'cognizable liberty or property interest' protected by the Due Process Clause." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Christie*, 850 F. Supp. 2d 455, 460 (D.N.J. 2012) (*quoting Mudric v. Att'y General*, 469 F.3d 94, 98 (3d Cir. 2006)). Only then may a plaintiff seek to demonstrate that "the procedures attendant upon that deprivation were [not] constitutionally sufficient." *Williams v. Silverman*, No. 12-974, 2013 WL 6578980 at *3 (E.D. Pa. 2012) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

Here, there is no need to proceed beyond the first step in the procedural due process inquiry, which involves determining "whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). "Property interests, of course, are not created by the Constitution. Rather they are created . . . by existing rules or understandings that stem from an independent source." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *see generally Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002). No such property interest exists in the illegal machine gun that Plaintiff manufactured after ATF's erroneous approval of Plaintiff's ATF Form 1. Nor does a property interest exist in ATF's ministerial error that resulted in its faulty approval of his application.

---

1986 that machine guns are frequently "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime"). 103 F.3d at 281 (quoting 1986 U.S.C.C.A.N at 1330).

Plaintiff acknowledges that the GCA, as amended, prohibits any person from possessing a machine gun not lawfully possessed and registered prior to May 19, 1986. *See* Compl. ¶ 18, 20; 18 U.S.C. § 922(o).  This concession is fatal to Plaintiff's due process claim, because a protected property interest cannot exist absent a "legitimate claim of entitlement" to the property created by state or federal law.  *Roth*, 408 U.S. at 577; *Midnight Sessions, Ltd. v. City of Phila.*, 945 F.2d 667, 679 (3d Cir. 1991) ("A property interest subject to protection by the due process clause results from a 'legitimate claim of entitlement' created by an independent source such as state law.") (*overruled on other grounds* by *United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392, 400 (3d Cir.2003)).  In other words, because a machine gun constitutes "obvious contraband under Federal law," *see United States v. Montrom*, 345 F. Supp. 1337, 1339 (E.D. Pa. 1972), Plaintiff "cannot seriously argue that he had a protected property interest" in the weapon he manufactured.  *Lyon v. Farrier*, 730 F.2d 525, 527 (8th Cir. 1984); *see Cooper v. City of Greenwood, Miss.*, 904 F.2d 302, 305 (5th Cir. 1990) ("Courts will not entertain a claim contesting the confiscation of contraband per se because one cannot have a property right in that which is not subject to legal possession"); *United States v. Jeffers*, 342 U.S. 48, 53-54 (1951) (Congress may "abrogat[e] property rights" in prohibited goods, foreclosing any "entitle[ment] to have [them] returned").

The status of machine guns as prohibited contraband under federal law likewise precludes Plaintiff from establishing a property interest in his erroneously-approved application to manufacture a machine gun.  As an initial matter, "[w]here a citizen voluntarily enters into an area which from the start is subject to pervasive Government control, a property interest is likely lacking."  *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012); *see also Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 272 (5th Cir. 2012)

31

(similar).  In light of the comprehensive scope of federal firearms regulation, the NFA and GCA

delineate such an area of pervasive control.  *See Mitchell Arms, Inc. v. United States*, 7 F.3d 212,

216 (Fed. Cir. 1993).   This principle is implicitly acknowledged by Plaintiff's own efforts to

comply with the regulatory framework, as he alleges in his Complaint.  *See* Compl. ¶¶ 37-38.

When Plaintiff decided to make a machine gun, he took action by requesting approval from the

government to make a machine gun, not by taking any action independent of government

regulatory authority.  *See id*.

　　The background law provided by the GCA and NFA likewise demonstrates that there is

no "independent source" of law or authority that could create a cognizable property interest here.

Because 18 U.S.C. § 922(o)(1) prohibits the possession of machine guns, ATF cannot approve a

Form 1 application to manufacture a machine gun without violating the GCA and NFA, unless

such application is filed at the request of a government entity.  *See* 26 U.S.C. § 5861(f); 27

C.F.R. §§ 479.65, 479.105(e).   In compliance with these legal provisions, no Form 1 applications

to make machine guns have been approved since May 19, 1986 except at the request of

government entities.  Plaintiff did not submit his Form 1 application at the request of a

government entity, and he therefore does not have any "legitimate claim of entitlement," *Roth*,

408 U.S. at 577, to have ATF act unlawfully in his favor.[20]  *See id.*; *cf. Gunkel v. City of

Emporia*, 835 F.2d 1302, 1304-05 (10th Cir. 1987) (no property interest created where issuance

of permit violated underlying law).  That Plaintiff's claim of entitlement to approval of his Form

1 application is not "legitimate" is further illustrated by his concession that, under the

---

[20] Plaintiff errs in his claim that no "authority exists to allow or authorize [ATF] to disapprove or revoke" authorization after it makes a mistake.  Compl. ¶ 41.  It is axiomatic that ATF possesses the authority "to reconsider and rectify errors" because an "agency, like a court, can undo what is wrongly done by virtue of its order."  *Gun South Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989) (*quoting United Gas Improvement Co. v. Callery Properties*, 382 U.S. 223, 229 (1965)); *see also Dun & Bradstreet Corp. Foundation v. U.S. Postal Service*, 946 F.2d 189, 193 (2d Cir. 1991) ("It is widely accepted that an agency may, on its own initiative, reconsider its interim or even its final decisions, regardless of whether the applicable statute and agency regulations expressly provide for such review").

interpretation of the law described in its March 17, 2014 letter, approval of Plaintiff's application would "itself violate[] the law."  Compl. ¶¶ 29, 54.

A property interest is also frequently lacking where the alleged property lacks the entitlements to "to possess, use, exclude, profit, and dispose" that are generally included in "the concept of 'property.'"  *United States v. Hedaithy*, 392 F.3d 580, 600 (3d Cir. 2004) (quoting *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997); *see Hearts Bluff Game Ranch*, 669 F.3d at 1330 (identifying these properties as "the ability to sell, assign, transfer, or exclude"). To the contrary, federal firearms laws expressly ensure that even if Plaintiff could be lawfully authorized to manufacture a machine gun, that authorization could not be assigned, sold, or transferred because no other person may make a firearm without filing his *own* written application "identif[ying] himself" and "obtain[ing] approval."  26 U.S.C. § 5822.  This is in addition to the NFA's requirements that limit Plaintiff's ability to transfer a machine gun once made.  *See id.* § 5812.  The absence of an ability to convey or transfer the authorization reinforces the conclusion that there is no protected property interest here.

To be sure, issuance of an administrative approval or a license can, under certain circumstances, lead to the creation of a property interest protected by the Due Process Clause. *See Lindsay v. City of Phila.*, 844 F. Supp. 229, 234 (E.D. Pa. 1994).  To gain such protection, however, the "continued possession" of the government approval must "become essential in the pursuit of a livelihood," in which case procedural due process limits the government's freedom to withdraw the approval.  *Bell v. Burson*, 402 U.S. 535, 539 (1971).  Here, there are no such allegations that Plaintiff intended to leverage the authorization to make a single machine gun into a "livelihood," *id.*, nor, given the law regulating possession, sale, and transfer of such firearms, would it have been in any way reasonable for him to formulate an expectation that he could in

33

reliance on ATF's erroneous authorization.  *See Mitchell Arms*, 7 F.3d at 216-17 ("[T]he right to

sell" regulated firearms "is not a right inherent in [a] plaintiff's ownership of those weapons.").

Given the brief period before Plaintiff became aware of ATF's ministerial error, Plaintiff's

submission of only two applications to manufacture machine guns (of which only one was

granted), and the backdrop of existing rules and understandings, the Constitution did not prohibit

ATF from correcting its erroneous approval here.[21]  *Bell*, 402 U.S. at 539.

> ### D.     The Court Should Dismiss Plaintiff's Equal Protection and Detrimental Reliance Claims Because Plaintiff Has Failed to Establish the Necessary Elements.

> #### 1.          ATF Has Not Violated the Equal Protection Component of the Due Process Clause.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall

. . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const.,

amend. XIV, § 1.  Although this clause expressly applies only to the States, the Supreme Court

has found that its protections are encompassed by the Due Process Clause of the Fifth

Amendment, and are therefore applicable to the federal government.  *Bolling v. Sharpe*, 347 U.S.

497 (1954).  Congress is presumed to act within its powers when it passes legislation, however,

and federal statutes challenged for denial of equal protection are entitled to deferential review as

long as the "legislative classification or distinction 'neither burdens a fundamental right nor

targets a suspect class.'"  *Vacco v. Quill*, 521 U.S. 793, 799 (1997) (quoting *Romer v. Evans*, 517

---

[21] For similar reasons, even if a cognizable property interest existed, its deprivation would not be constitutionally inadequate.  "Rather than setting categories of mandatory procedural protections in all cases," courts determine "the nature and timing of the requisite process in an individual case by accommodating the relevant competing interests." *Gun South*, 877 F.2d at 867 (*citing Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982)).  ATF's rapid reversal of the error within 48 hours, the need for quick action to prevent Plaintiff from mistakenly manufacturing a dangerous and unusual weapon, and the limited effort required to submit a new ATF Form 1 if Plaintiff believed ATF's decision to be in error, demonstrate that the opportunity for Plaintiff to reapply to ATF constitutes sufficient due process in this circumstance.  *See Nat'l Amusements, Inc. v. Borough of Palmyra*, 716 F.3d 57, 62 (3d Cir. 2013) (post-deprivation remedies satisfy due process where "a State must act quickly, or where it would be impractical to provide predeprivation process"); *cf. O'Brien v. Seay*, 263 F. App'x 5, 9 (11th Cir. 2008) (opportunity to resubmit forms to responsible government official constitutes sufficient process).

U.S. 620, 631 (1996)).  Nor does the Constitution require that "things which are different in fact or opinion . . . be treated in law as though they were the same."  *Plyler v. Doe*, 457 U.S. 202, 216 (1982).

Plaintiff claims that "[u]pon information and belief, [ATF] has approved the manufacture and transfer of post-1986 machineguns to various individuals," and that "[p]ermitting others to possess and/or manufacture post-1986 machineguns" is a denial of equal protection.  Compl. ¶¶ 75-76.  As an initial matter, Plaintiff has failed to meet the pleading standard laid out by the Supreme Court in *Twombly* and *Iqbal* because his allegation does not include "factual content that allows the court to draw the reasonable inference that [] defendant[s] [are] liable" or rise "above the speculative level."  *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555-56.  Plaintiff's allegation that others are being allowed to possess machine guns "upon information and belief" requires a "context-specific" evaluation that "requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 551.

Here, "experience and common sense," as applied to the relevant law, illustrates that Plaintiff's "naked assertions, devoid of further factual enhancement," are insufficient to maintain an equal protection claim.  *Iqbal*, 556 U.S. at 679 (internal quotations and citations omitted).  Plaintiff does not allege that any distinction between him and the individuals he alleges have been permitted to obtain machine guns are based on his membership in a suspect class.  *See* Compl. ¶¶ 31, 75.  Absent such an allegation, an equal protection claim must be evaluated under rational basis scrutiny.  *See Mabey Bridge & Shore, Inc. v. Schoch*, 666 F.3d 862, 876 (3d Cir. 2012).  Thus, the government may distinguish between Plaintiff and any other applicant for ownership of a machine gun "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only

conclude that the government's actions were irrational." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000).  Because Plaintiff has not articulated an equal protection claim that explains both who has been treated more favorably and why there is no legitimate purpose to do so, his claim does not meet the *Iqbal* pleading standard and must be dismissed.  *See, e.g.*, *Williams v. Calderoni*, No. 11-3020, 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012) (pleading of discrimination claim "on information and belief" – even where plaintiff is a member of a suspect class – is insufficient to state a claim).

> **2.      The Court Should Dismiss Plaintiff's Detrimental Reliance Claim Because ATF's Mistaken Approval of His Application Does Not Give Rise to a Detrimental Reliance Claim Against the Federal Government.**

Plaintiff's final claim is for equitable estoppel.  Specifically, Plaintiff alleges that when an ATF examiner mistakenly approved Plaintiff's application to make a machine gun, ATF "knew or should have known that its approval would induce action by the Plaintiff, [and] the [agency's] approval did induce such action."  Compl. ¶ 78.  Consequently, Plaintiff avers that ATF "should be estopped from revoking" that mistaken approval, and urges the Court to enjoin the agency "from taking any further action against Plaintiff in an attempt to enforce 18 U.S.C. § 922(o), 26 U.S.C. § 5801, and any other regulation, statute or [ATF] internal rule, known or unknown . . . ."  *Id.* ¶¶ 78-79.

This claim fails as a matter of law.  It is well established "that equitable estoppel will not lie against the Government as it lies against private litigants."  *Office of Pers. Mgmt. (OPM) v. Richmond*, 496 U.S. 414, 419 (1990); *accord Johnson v. Guhl*, 357 F.3d 403, 409 (3d Cir. 2004).  The Supreme Court has succinctly stated the rationale for this rule: "When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined."  *Heckler v.*

*Cmty. Health Servs.*, 467 U.S. 51, 60 (1984).  Although the Supreme Court has yet to issue a blanket rule that there can be no estoppel against the federal government, it has acknowledged that the arguments for advancing such a rule "are substantial."  *OPM*, 496 U.S. at 423 (leaving "for another day whether an estoppel claim could ever succeed against the Government").  And tellingly, the Supreme Court has rarely, if ever, validated the application of estoppel against the federal government.  *See id*. at 420-21 (noting that the Court has never upheld a finding of estoppel, but recognizing that its dicta may have suggested the possibility).

In any event, Plaintiff has failed to plead sufficient facts to state a claim for equitable estoppel here.  "[T]o succeed on a traditional estoppel defense the litigant must prove (1) a misrepresentation by another party; (2) which he reasonably relied upon; (3) to his detriment."  *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir. 1987).  Additionally, however, "a litigant must prove 'affirmative misconduct' to succeed on an estoppel claim against the government."  *Id*. (citations omitted).  Demonstrating "proof of affirmative misconduct on the part of the Government" is "a burden not easily met."  *Yang v. INS*, 574 F.2d 171, 175 (3d Cir. 1978).

Plaintiff's allegations do not portray any affirmative misconduct by ATF, and he therefore cannot establish a valid claim of equitable estoppel.[22]  At most, Plaintiff has shown that the ATF examiner who mistakenly approved Plaintiff's application to make a machine gun acted in error, under the wrongful belief that the application presented valid grounds for Plaintiff to make a machine gun.  Such a mistaken action does not constitute affirmative misconduct.  *See Schweiker v. Hansen*, 450 U.S. 785, 790 (1981) (government agent's advice misinforming plaintiff that she was not eligible for social security benefits did not constitute affirmative

---

[22] Additionally, it is questionable whether Plaintiff has demonstrated that any reliance he placed on the approval of the application was reasonable.  *See Asmar*, 827 F.2d at 915 n.10 ("[T]he general rule is 'that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to the law.'") (quoting *Heckler*, 467 U.S. at 63).

misconduct supporting estoppel); *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384-85 (1947) (concluding that farmer could not recover under crop insurance on a lost crop even though the government agency misinformed the farmer that his crop had been covered by government-provided insurance when, in fact, a statute forbade such coverage); *Savoury v. U.S. Att'y Gen*., 449 F.3d 1307, 1319 (11th Cir. 2006) (no affirmative misconduct where INS granted alien permanent resident status for ten years prior to deportation based on criminal conviction, despite the fact that the agency knew of the alien's conviction at the time it granted permanent resident status).

These principles apply with equal force where the erroneous action involves ATF's administration of federal firearms laws.  In the events reviewed by the D.C. Circuit in *F.J. Vollmer Co. v. Higgins*, 23 F.3d 448 (D.C. Cir. 1994), ATF had rejected an application from a firearms manufacturer to transfer a machine gun, on the grounds that 18 U.S.C. § 922(o) prohibited the manufacturer from "transfer[ring] or possess[ing] a machinegun."  *Id*. at 449.  The manufacturer brought suit against ATF, seeking judicial review of the denial of that transfer application, claiming reliance on an ATF letter advising that it could legally modify the receiver of a semi-automatic rifle into a machine gun.[23] *Id*. at 450.  The D.C. Circuit rejected the manufacturer's estoppel argument, finding that even if the manufacturer were correct, the agency's representation would not constitute affirmative misconduct:

> In an argument based on an estoppel theory, Vollmer claims to have relied upon a letter from the Bureau advising the company that it could legally reconfigure the receivers.  The argument goes nowhere.  The letter did not directly mention receiver modifications. Even if we interpreted the Bureau's general statements to comprehend that subject, the letter by no means represents the sort of affirmative misconduct required to estop the government from enforcing its laws.

---

[23] A "receiver" is defined by ATF regulations as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechlock, and firing mechanism, and which is usually threaded at its forward position to receive the barrel."  27 C.F.R. § 478.11.

*Id.* (citations omitted).  The ATF examiner's erroneous approval of Plaintiff's application is no different: it is not the type of conduct that could trigger a finding of affirmative misconduct supporting equitable estoppel against the government.  Plaintiff has therefore failed to state a valid claim of equitable estoppel.

## **CONCLUSION**

This Court lacks subject matter jurisdiction over Plaintiff's Second Amendment and Commerce Clause claims because Plaintiff fails to show that his alleged injury-in-fact is traceable to the challenged laws, or that a favorable decision is likely to redress this alleged injury.  Furthermore, these laws do not impose a substantial burden on conduct that is protected by the Second Amendment and would pass constitutional muster in any event.  Plaintiff's other constitutional claims and his claim of detrimental reliance are likewise without basis in fact and law.  Accordingly, the Court should dismiss this case or enter summary judgment for Defendants.


Dated:  January 16, 2015                         Respectfully submitted,

                                                 JOYCE R. BRANDA
                                                 Acting Assistant Attorney General

                                                 ZANE D. MEMEGER
                                                 United States Attorney

                                                   /s/ *Eric J. Soskin*
                                                 DIANE KELLEHER
                                                 Assistant Branch Director
                                                 ERIC J. SOSKIN
                                                 DANIEL RIESS
                                                 Trial Attorneys
                                                 U.S. Department of Justice
                                                 Civil Division, Rm. 7116
                                                 20 Massachusetts Avenue, NW
                                                 Washington, D.C. 20530

Telephone: (202) 353-0533
Fax: (202) 616-8460
Email: Eric.Soskin@usdoj.gov
*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

On January 16, 2015, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Eastern District of Pennsylvania, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2) or the local rules.


 /s/ Eric J. Soskin
Eric J. Soskin