# EXHIBIT 3

132 Cong. Rec. 9,602 (1986)

Mr. METZENBAUM. Mr. President, I yield to the Senator from Massachusetts in order that he may suggest——

Mr. HATCH. Mr. President, I have the floor, but I yield to the Senator from Massachusetts.

Mr. KENNEDY. Mr. President, I will not object to the inclusion of the colloquy in the RECORD, so long as a colloquy can also be included in the RECORD between the Senator from Ohio and me related to the same subject matter.

Mr. HATCH. I have no objection.

The PRESIDING OFFICER. Without objection, it is so ordered.

SYMMS-MCCLURE COLLOQUY

Mr. SYMMS. Mr. President, will the author of the bill yield for a question?

Mr. McCLURE. I am delighted to yield.

Mr. SYMMS. A question has arisen recently regarding what constitutes being "engaged in the business," regarding a person functioning as an agent or a broker. An example of the kind of activity in question would be a manufacturer's representative who has traditionally functioned without a Federal firearms license because he is not a dealer. Specifically a broker or an agent has no inventory, and firearms never pass through his possession during a transaction. Brokers and agents such as manufacturer's representatives find customers and put them in contact with sellers, but are not engaged in the actual dealer transfer during which time the BATF form 4473 is filled out by the seller and the buyer. Does the definition of dealer and being engaged in the business in this bill make it clear that brokers and agents do not need Federal firearms licenses?

Mr. McCLURE. The definition of dealer says that one is involved in "the repetitive purchase and resale of firearms." Clearly, the actual sale is the one made by the dealer. If the firearms actually pass into the possession of a third party, then the form 4473 would have to be filled out by the seller and such a middleman. The middleman would then fill out the form 4473 with the ultimate buyer. But as long as an agent or a broker is acting on behalf of a seller without ever having possession, the agent or broker would clearly not be a dealer, and would not need to have a Federal firearms license, nor has the definition of dealer ever been interpreted to include those persons who have been involved in firearms sales or transactions but who have not at any time been in physical possession of the firearms such as agents, brokers or consultants.

METZENBAUM-KENNEDY COLLOQUY

Mr. METZENBAUM. Mr. President, I thank the Senator from Massachusetts [Mr. KENNEDY] for his suggestion that we comment on some of the points raised by our colleagues here on some implications of S. 49, especially as they relate to the machinegun amendments adopted by the House.

We have heard it said that there was little debate on this issue in the House and therefore little legislative history. But I believe my friend from Massachusetts [Mr. KENNEDY] has been in touch with the sponsors of the provisions on machineguns, as I have, and I would like to see what your understanding is on a number of issues which have been raised.

First, the House version, which we are about to vote on here, has a very important improvement from the bill the Senate adopted last July, and that is to ban the transfer, possession of any machinegun not lawfully possessed on the date of enactment.

It has been suggested here that a manufacturer in possession of parts of machineguns could register and, therefore, grandfather those parts under the provisions of this bill. Is this the Senator's understanding?

Mr. KENNEDY. No, it certainly is not. From my conversations with the House committee, and with law enforcement officials tonight, it is clear that they consider the operative notice is filed subsequent to manufacture. Therefore, such parts—regardless of their intended use—not yet assembled, do not constitute a machinegun under the National Firearms Act unless the specific parts qualify as a machinegun as defined by that act.

I have been told by BATF officials that examples of such parts would include conversion kits and combinations of parts from which a machinegun can be assembled. Machinegun parts, in most instances, do not require registration, are not machineguns, and would not be covered by the act.

Mr. METZENBAUM. I thank the Senator, for that is my understanding from my discussions earlier in the day with the police groups.

Another question has been over granting amnesty to people who now possess machineguns outside of the law. As the Senator knows, this was one of the proposals offered this afternoon as part of this compromise package, but it was rejected by us, and strongly by the law enforcement agencies.

Do you believe that an amnesty period can be administratively declared by the Secretary of the Treasury by the enactment of this bill?

Mr. KENNEDY. Yes, I am aware of the discussions earlier today on the question of amnesty, and I joined the Senator in rejecting any such proposal.

There is nothing in this bill that gives such an authority, and there is clearly no valid law enforcement goal to be achieved by such an open-ended amnesty.

The only thing that has changed about the machinegun situation since the 1968 act, and the limited amnesty granted then, is that machineguns have become a far more serious law enforcement problem.

So, I see no new legislative authority or law enforcement purpose that would be served by such an amnesty—and that is the strongly held view of all the law enforcement groups, including the Federal Law Enforcement Officers Association.

Mr. METZENBAUM. Finally, I would like to discuss with the Senator another provision of the House bill—which I know that he and I support—and that is the amendment which maintained existing law on the interstate sale of handguns.

I know that was an issue the Senator from Massachusetts raised time and time again during the Judiciary Committee's consideration of this legislation during the last two Congresses, and when we considered it here on the Senate floor last July. Although we couldn't get support for it here, at least the NRA was not able to roll the House of Representatives. They listened to the police groups and followed their plea to keep existing laws on the interstate sale of handguns.

Mr. KENNEDY. Mr. President, I appreciate the Senator's comments, and he is correct that the House action represented a fundamental step in keeping this bill from completely gutting the intent of the 1968 act.

The House version also accomplishes what I tried to do here in the Senate—and that is to draw a distinction between how we deal with handguns versus rifles and long guns. In 1983 I offered the basic compromise that I would be willing to go along with steps to ease controls on long guns and other sporting weapons, if we would only maintain, if not strengthen, controls on handguns.

I am gratified that the House version of the bill—which will be the bill that reaches the President's desk—rejects the NRA's attempt to weaken existing controls on handgun sales. It makes the distinction we repeatedly tried to make here, that there is a great difference between easing paperwork and other controls on sporting weapons, but absolutely no legitimate sporting purpose to ease them on handguns—especially the "snubbies" and "Saturday Night Specials" which have now legitimate sporting purpose.

Mr. METZENBAUM. Mr. President, I thank the Senator, and join in his comments.

Mr. HATCH. Mr. President, before I cast my vote in favor of this bill, I have a further question which concerns the definition of parts for a machinegun. The language of the bill is clear, but a member of my staff has pointed out that the description of this provision on the floor of the other body could cause it to be misinterpreted, with potentially serious conse-