IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RYAN S. WATSON Individually and as<br>    Trustee of the WATSON FAMILY<br>    GUN TRUST, | ) <br> ) <br> ) <br> ) | Case No.2:14-cv-06569-SD |
|     Plaintiff, | ) <br> ) | |
|             v. | ) <br> ) | |
| ERIC H. HOLDER, JR., Attorney General of<br>    the United States, and B. TODD JONES,<br>    Director of the Bureau of Alcohol Tobacco<br>    Firearm & Explosives, | ) <br> ) <br> ) <br> ) | |
|     Defendants. | ) <br> ) <br> ) | |

**BRIEF IN OPPOTION TO DEFENDANTS' MOTION TO DISMISS, OR IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT**

NOW COMES Plaintiff, Ryan S. Watson, Individually and as Trustee of the Watson

Family Gun Trust, by and through the undersigned counsel, in opposition to the Defendants'

Motion to Dismiss, or in the Alternative, for Summary Judgment, and for the foregoing reasons

request that the Defendants' Motion be denied.

## TABLE OF CONTENTS

INTRODUCTION ………………………………………..……………………………2

STANDARD OF REVIEW …………………………………………………………….4

ARGUMENT ………………………………………………………………………...5

    I.  Standing …………………………………………………………………………5

   II.  Second Amendment …………………………………………………………...8

         A.  18 U.S.C. § 922(o) is Unconstitutional as it Amounts to a Categorical
             ban Akin to those Struck Down in *Heller* and M*cDonald* …..…………10

         B.  Machine Guns Fall Under Second Amendment Protection ……………..12

             i.  The "Dangerous and Unusual" Standard …………………………13

            ii.  Longstanding Regulations ………………………………………17

         C.  Strict Scrutiny Applies ……………………………………………………21

         D.  18 U.S.C. § 922(o) Does Not Survive Strict Scrutiny ……………...........22

         E.  Even if Intermediate Scrutiny Applies, 18 U.S.C. § 922(o) Still Fails ….24

  III.  Article I – Interstate Commerce Clause …………………………….............27

  IV.  Due Process …………………………………………………………………29

   V.  Equal Protection …………………………………………………………...33

  VI.  Detrimental Reliance …………………………………………………...34

CONCLUSION …………………………………………………………………38

## INTRODUCTION

For most of our nation's history, the federal government had little or no involvement in the firearms regulation arena.  Rather, firearms have historically been the prerogative of the state governments.  It was not until the passage of the National Firearms Act in 1934 ("NFA") that the federal government began to extend its hand into firearms regulation.  The NFA sought to regulate the manufacture and transfer of certain firearms by, in sum, (1) requiring a person seeking to make or transfer an NFA firearm to file an application with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("BATFE"), (2) obtain BATFE approval, (3) have the firearm registered in the National Firearms Registration and Transfer Record (completed by BATFE upon approval), and (4) pay a $200 tax which is evidenced by the BATFE's attachment of a tax stamp on the application which is then returned to the maker or transferor.  26 U.S.C. §§ 5812, 5822.  Possession of an NFA firearm not registered to the possessor is a felony punishable by ten years imprisonment and a fine of $250,000.  26 U.S.C. §§ 5861(d); 18 U.S.C. § 3571(b).  Machine guns, defined as any firearm capable of firing more than one round automatically with a single trigger pull, fall under the purview of the NFA.  26 U.S.C. § 5845(b).

In 1986, 18 U.S.C. § 922(o) was codified into law under the Gun Control Act of 1968 ("GCA") and prohibits a "person" from transferring or possessing a machine gun manufactured after May 19, 1986.  While an unincorporated trust falls under the definition of "person" in the NFA, 26 U.S.C. § 7701(a)(1), a trust is not included in the definition of "person" under the GCA, 18 U.S.C. § 921(a)(1).   Accordingly, a trust wishing to manufacture a machine gun is subject to the provisions of the NFA, but is not subject to the GCA's prohibition on possession of post-1986 machine guns.  The BATFE is charged with the administration and enforcement of the NFA and GCA, and is overseen by the Defendants.

Plaintiff Ryan Watson, as trustee of the Watson Family Gun Trust, submitted the proper applications (commonly known as a "Form 1") to the BATFE pursuant to the NFA for authority to manufacture an M-16 style machine gun from an AR-15 semi-automatic lower receiver owned by the Watson Family Gun Trust.[1]   Plaintiff submitted an application in paper form, and then later a second application electronically.  *See* Aff. of Ryan Watson, attached hereto as Ex. "A". The second application was approved by the BATFE and electronically returned to Plaintiff on or about August 5, 2014, thus authorizing him to manufacture a machine gun.  *See* Compl. Ex. "B."  Some time thereafter, Plaintiff performed the necessary modifications to the AR-15 style receiver to transform it into a machine gun.  On or about September 10, 2014, after the modifications had been performed,[2] Plaintiff received an email from the BATFE stating that the application was "disapproved" because of 18 U.S.C. § 922(o) and that the firearm was no longer registered in the National Firearms Registration and Transfer Record.  *See* Watson Aff. Ex. "A". Plaintiff later received the paper application, which had clearly been marked "approved," whited-out, disapproved and returned to him.  *Id.*  After being informed by the BATFE that they considered his continued possession of the now unregistered machine gun to be a felony punishable by ten years in prison, Plaintiff surrendered the firearm under protest.  *Id.*

Plaintiff brought the present suit challenging the authority of Congress to enact the NFA and 18 U.S.C. § 922(o) under the Interstate Commerce Clause and the constitutionality of the acts under the Second Amendment, challenging the constitutionality of the Defendants' actions in summarily revoking his authority to manufacture a machine gun and in essence confiscating

---

[1] The fully automatic M-16 is virtually identical to the semi-automatic AR-15 rifle with the exception of additional minor milling in the lower receiver required to hold a sear which permits automatic fire in the M-16.  On the AR-15/M-16 platform, the lower receiver, which houses the trigger assembly and magazine, is what is legally considered a firearm and subject to federal and state firearms regulations.
[2] Once the modifications are performed to convert an AR-15 lower receiver into an automatic capable M-16 receiver, it is impossible to reverse the modifications and eliminate the machine gun classification of the receiver.

the manufactured firearm under the Due Process Clause and Equal Protection Clause, as well as seeking to have the Defendants enjoined from taking any further action against him or denying the validity of the approved application on the basis of detrimental reliance and that the plain language of 18 U.S.C. § 922(o) does not prohibit an unincorporated trust from possessing a machine gun.

The Defendants have now filed a Motion to Dismiss, or in the Alternative, for Summary Judgment.  In so doing, the Defendants first argue that the Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(1) because Plaintiff lacks the necessary traceability and redressability standing requirements.  Next, the Defendants argue the Complaint should be dismissed pursuant to Rule 12(b)(6), for failure to state a claim, or in the alternative for summary judgment.  However, no argument has been presented for dismissal or summary judgment as to the last aspect of Plaintiff's Complaint, that the plain language of 18 U.S.C. § 922(o) does not prohibit an unincorporated trust from possessing a post-1986 machine gun.  Plaintiff now presents this brief in opposition to the Defendants' Motion.

## STANDARD OF REVIEW

The Defendants first ask this Court to dismiss the Complaint under Rule 12(b)(1) for want of standing.  The "standard for surviving a Rule 12(b)(1) motion is a low one." *Amberg-Blyskal v. Transp. Sec. Admin.*, 832 F. Supp. 2d 445, 447 (E.D. Pa. 2011).  A Plaintiff must merely show: (1) an "injury in fact"; (2) a "causal connection between the injury and the conduct complained of;" and (3) that a favorable decision is likely to redress the injury.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

The Defendants next ask the Court to dismiss each count of the Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  To survive a 12(b)(6)

motion, a Plaintiff does not need to plead "detailed factual allegations," but only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 544 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47(1957)). In evaluating a 12(b)(6) motion, a court must accept "all allegations in the complaint as true, viewing them in the light most favorable to the plaintiffs," *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000), and "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief," *Pinkerton v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002). "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

Alternatively, the Defendants move for summary judgment. Pursuant to Rule 56, summary judgment is only proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In reviewing a summary judgment motion, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001)(quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

## ARGUMENT

### I.   Standing

The Defendants first attack Plaintiff's standing to bring the present suit. Def.'s Br. in Supp. 8-11. To establish standing a Plaintiff must show: (1) an "injury in fact"; (2) a "causal connection between the injury and the conduct complained of"; and (3) that a favorable decision is likely to redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The injury-in-fact element "is not Mount Everest. The contours of the injury-in-fact requirement,

while not precisely defined, are very generous, requiring only that claimant allege [ ] some specific, identifiable trifle of injury." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (quoting *Danvers Motor Co. Inc. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005)).

Plaintiff meets the standing requirements.  First, Plaintiff satisfies the injury-in-fact prong by having been deprived of Second Amendment rights and having property confiscated.  Indeed, the Defendants do not even argue that Plaintiff does not meet the injury-in-fact requirement.  Secondly, said injury was caused directly by the Defendants' actions in interpreting and enforcing 18 U.S.C. § 922(o) and the NFA.  As the Defendants admit, it was the Defendants that retracted approval of Plaintiff's approved Form 1 application, disapproved his second Form 1 application, and confiscated his firearm based on their interpretation of 18 U.S.C. § 922(o) and the NFA.  Def.'s Br. in Supp. 6-7.  Lastly, a decision by this Court declaring the aforementioned laws unconstitutional and prohibiting the Defendants from the enforcement thereof will redress Plaintiff's injury by requiring the Defendants to permit Plaintiff to possess machine guns.

As stated, the Defendants do not contest Plaintiff's standing under the injury-in-fact prong but rather assert that (1) Plaintiff's injury is not traceable to federal law or the Defendants' actions, and (2) that Plaintiff's injury cannot be redressed because the Commonwealth of Pennsylvania is not a party to the suit.  *Id.* at 9-11.  The Defendants' argument against Plaintiff's standing is constructed upon a mischaracterization of Pennsylvania law as independently forbidding Plaintiff's possessing a machine gun so that Plaintiff's injury is not traceable to the Defendants, nor is it redressable by this Court without the Commonwealth of Pennsylvania being added as a Defendant.  *Id.* at 9-10.  The Defendants quote 18 Pa.C.S.A. § 908(a) to state that "A person commits a misdemeanor of the first degree if, except as authorized by law, he . . .

possesses an offensive weapon," with a machine gun being characterized as an "offensive weapon."  Def.'s Br. in Supp. 9.  Because Pennsylvania law supposedly "bars [Plaintiff's] possession of a machine gun," the Defendants contend, "Plaintiff cannot show that any alleged harm is caused by the NFA and GCA."  *Id.*

The Defendants' claim is easily debunked by simply reading the letters sent to Plaintiff by the Defendants, not the Commonwealth of Pennsylvania, which cite the GCA and NFA, not Pennsylvania law, as the reasoning for Plaintiff's applications being denied/revoked and firearm being confiscated.  *See* Comp. Ex. "C" (citing "922(o)" as the reason for disapproval), Ex. "D" (stating "ATF must deny your application to make and register a machinegun, pursuant to 18 U.S.C. § 922(o), 26 U.S.C. § 5822, and 27 C.F.R. §§ 478.36, 479.105(a)."), and Ex. "E" (citing "18 U.S.C. § 922(o), 26 U.S.C. §§ 5812 and 5822, and 27 C.F.R. § 479.105" as the reason ATF could not approve the application).  Quite simply, the Defendants used the NFA and GCA as a basis to violate Plaintiff's constitutionally protected rights and accordingly, Plaintiff's injury is directly traceable to the Defendants and the challenged laws, and a favorable ruling will redress the injury.

The Defendants ultimately correct their mischaracterization of Pennsylvania law, albeit merely in a footnote, by acknowledging an exception to Pennsylvania's machine gun prohibition for when the possessor of the machine gun "complied with the National Firearms Act."  18 Pa. C.S.A. § 908(b)(1).  In other words, Pennsylvania law does not prohibit machine guns, but merely requires compliance with federal law.  Accordingly, as Plaintiff fully complied with the NFA (indeed the Defendants make no allegation to the contrary) the statute quoted by the Defendants quite clearly did not Prohibit Plaintiff from possessing the machine gun at issue.

Nonetheless, the Defendants argue that should the Court declare machine guns protected under the Second Amendment and the NFA unconstitutional, then the NFA exception in Pennsylvania law would disappear, theoretically converting the Pennsylvania law into an outright prohibition on the possession of machine guns. *See* Def.'s Br. in Supp. n.7. First, the Defendants fail to acknowledge that should the Court declare machine guns protected under the Second Amendment and strike down 18 U.S.C. § 922(o) and the NFA, then as the Second Amendment has been incorporated against the states in *McDonald v. Chicago*, 561 U.S. 742 (2010), any theoretical Pennsylvania prohibition on machine guns would also be unconstitutional. Secondly, even if the Defendants' argument had any merit, such merit would only go to attacking Plaintiff's standing to challenge the National Firearms Act, not any of Plaintiff's other claims for relief. Accordingly, the Defendants' argument that Plaintiff lacks standing due to an indispensible party not being a party to the suit lacks merit and should be denied.

## II.      Second Amendment

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. "[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The right to keep and bear arms is not "granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." *Id.* (quoting *United States v. Cruikshank*, 92 U.S. 542, 553 (1876)).

While the meaning and scope of other constitutional rights, such as the First Amendment's right to free speech, have been well developed by the Supreme Court over a

number of decades, the Supreme Court has only recently found cause to begin extrapolating the meaning and reach of the right to keep and bear arms.  To date, the Supreme Court has only had opportunity to define the Second Amendment in *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010).  In *Heller*, the Court declared the Second Amendment to protect an individual right to keep and bear arms while finding the District of Columbia's categorical ban on the possession of handguns to infringe that right.  In *McDonald*, the Court merely held the Second Amendment to apply against the states through the Fourteenth Amendment's Due Process Clause and struck down a similar de facto ban on handguns.

Prior to *Heller*, the only other consideration given to the Second Amendment by the Supreme Court was a brief, confusing, and often criticized opinion in *United States v. Miller*, 307 U.S. 174 (1939).  In *Miller*, the Court merely held  that "absen[t] of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument."  *Id.* at 178.

Although the Defendants almost exclusively phrase their Second Amendment discussion in terms of self-defense, it is clear that the Amendment has at its root reasons that extend beyond mere self-defense.  While *Heller* held that that the heart of the Second Amendment is the "core lawful purpose of self-defense," *Heller* 554 U.S. at 630, the Court also cited protected activities such as hunting and resistance of tyranny, *Id.* at 599-600.  *See also Silveira v. Lockyer*, 328 F.3d 567, 569-70 (9th Cir. 2003) (discussing the Second Amendment's purpose in defecting tyranny and stating "But the simple truth—born of experience—is that tyranny thrives best where government need not fear the wrath of an armed people.") (Kozinksi, J., dissenting).

Indeed, one of the few things that all nine justices in *Heller* agreed on was the Second Amendment's purpose in preserving liberty by making large standing armies unnecessary. *See Heller* 554 U.S. at 597-98 (stating the militia was important as "it renders large standing armies unnecessary"); *Id.* at 641 (stating the importance of the militia rested in "the profound fear shared by many in that era of the dangers posed by standing armies") (Stevens, J., dissenting). The founders, being weary of large standing armies as a threat to liberty, instead envisioned the ordinary people carrying their own arms as making up the front line of defense for our country.

The Supreme Court is yet to provide guidance as to how a court is to analyze a Second Amendment challenge.  However, the Third Circuit has adopted a two-part test.  First, a court is to look to "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."  *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).  If the law does impose a burden on a Second Amendment right, then the court is to "evaluate the law under some form of means-end scrutiny.  If the law passes muster under that standard, it is constitutional.  If it fails, it is invalid." *Id.*  In the present case however, the Court need not even concern itself with applying the *Marzzarella* two-step test as 18 U.S.C. § 922(o)'s prohibition on machine guns manufactured after 1986 amounts to a categorical ban similar to those struck down in *Heller* and *McDonald*.

### A.    18 U.S.C. § 922(o) is Unconstitutional as it Amounts to a Categorical Ban Akin to those Struck Down in *Heller* and *McDonald*

Unlike in *Marzzarella*, the Supreme Court in *Heller* and *McDonald* did not find a need to apply a form of means-end scrutiny in order to strike down the categorical prohibitions of handguns in the District of Columbia's and Chicago.  Rather, the Court justified its holdings by simply stating, "The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose [self-defense]" and that

10

under any level of scrutiny, the prohibition of the entire class of arms would fail to pass muster. *Heller*, 554 U.S. at 628.

Like the categorical ban on handguns struck down in *Heller* and *McDonald*, 18 U.S.C. § 922(o) constitutes a categorical ban on a class of firearms, namely those capable of firing more than one round with a single function of the trigger. Much like handguns are "overwhelmingly chosen by American society" for self-defense, machine guns are overwhelmingly chosen by militaries throughout the world for defense of county.[3] As defense of country is a lawful purpose of firearm ownership, and indeed as all nine justices agree in *Heller*, one of the leading motivators for the Second Amendment, the categorical ban on the entire class of weapons that would undoubtedly be used for that purpose is unconstitutional.

In contrast, the Defendants attempt to argue that founding era laws "strongly indicate that the [Second] Amendment does not foreclose categorical legislative prohibitions on classes of 'Arms,' including machine guns." Def.'s Br. in Supp. 16. In support, the Defendants cite three state statutes and the Second Militia Act for the contention that militia members were not afforded "unrestricted freedom to choose which 'Arms' they would possess." *Id.* However, the four cited laws merely required an enlisted man to supply himself with a "good" firearm for militia service.[4] It is quite clear that the purpose of the intended statutes was not a form of gun control, but rather to ensure that the militia was equipped with high quality firearms for the efficient defense of the nation. Surely if a militiaman had shown up for battle in the eighteenth

---

[3] Or in the case of the United States federal government and many state and local governments, machine guns are not just utilized by the military, but also virtually every agency and law enforcement body. Indeed, even the United States Department of Agriculture has put out a solicitation for machine guns! *Solicitation Number: USDAOIGWEA-5-7-14*, FEDERAL BUSINESS OPPORTUNITIES (May 7, 2014), https://www.fbo.gov/index?s=opportunity&mode=form&id=9fc3a01217d03b0354e1e18b69aa7bad&tab=core&_cview=0 (*last visited* Jan. 28, 2015).

[4] *See* Def.'s Br. in Supp. Ex. 4. (North Carolina required each man "furnish himself with one good rifle or smooth bored gun fit for service;" Virginia required "a good, clean musket;" and Ohio required "a good and sufficient sword and pair of pistols"). *See also* Def.'s Br. in Supp. 17. (The Second Militia Act required each man "provide himself with a good musket or firelock, a sufficient bayonet and belt . . .").

century carrying a modern machine gun, his commander would not have invoked one of the cited statutes to berate the man!  Furthermore, all of the quoted statutes merely require quality arms for militia service, and none prohibit the possession of any arms that would not meet the militia's quality standards outside of militia service.

Accordingly, 18 U.S.C. § 922(o) is appropriately viewed as an unconstitutional categorical prohibition of an entire class of weapons.  However, even applying *Marzzarella's* two-step approach, the statute does not pass scrutiny.

### B.  Machine Guns Fall Under Second Amendment Protection

Under the first prong of the *Marzzarella* test, a court looks to "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."  *Marzzarella*, 614 F.3d at 89.   *Heller* stated unequivocally "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *Heller*, 554 U.S. at 582.  In seeking to define the term "arms," the Court cited 18th century sources for the definition as "[w]eapons of offence, or armour of defence," *Id.* at 581 (quoting 1 Dictionary of the English Language 106 (4th ed.)(reprinted 1978)), and "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."  *Id.* (citing 1 TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY (1771)).  As the M-16 style rifle at issue here, is without a doubt a "bearable arm," it falls under the scope of the Second Amendment.[5]

Nonetheless, the Defendants make two broad arguments against machine guns falling under the ambit of the Second Amendment—first that they are "dangerous and unusual," and

---

[5] This is not to say necessarily that all machine guns are protected under the second amendment.  Indeed, *Heller* merely stated that "the Second Amendment extends prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582.  As the M-16 is the standard issue military rifle, and is certainly a "bearable arm," it not only comes under the language of *Heller* but also *Miller's* militia arms language.  Accordingly, at the very least, the M-16 at issue in this case is protected under the Second Amendment.

second, that "longstanding" regulations on machine guns indicate that 18 U.S.C. § 922(o) is "presumptively lawful."

### i.     The "Dangerous and Unusual" Standard

The Defendants contend that machine guns fall outside the scope of the Second Amendment because they are "dangerous and unusual."  The Defendants rest their assertion on *Heller's* referencing of "the historical tradition of prohibiting the *carrying* of 'dangerous and unusual weapons.'"  *Heller,* 554 U.S. at 627 (emphasis added).  However, as noted by the Court's language, the dangerous and unusual doctrine does not pertain to the mere *possession* of a firearm (or other weapon), but rather to the *manner* in which firearm is carried.  The present case is about the mere possession of a firearm, not the carrying.

Justice Scalia recently spoke of the origins of the dangerous and unusual standard stating "there was a tort called affrighting, which if you carried around a really horrible weapon just to scare people, like a head ax or something, that was, I believe, a misdemeanor."  Sarah Muller, *A Surprise for the NRA? Justice Scalia may be Open to Tighter Gun Control Laws,* MSNBC (Oct. 2, 2013), http://www.msnbc.com/the-last-word/surprise-the-nra.

The concept of "dangerous and unusual" likely stems from the common law crime called "affray."

> An affray, as has been noticed, is the fighting of two or more persons in some public place, to the terror of the citizens. There is a difference between a sudden affray and a sudden attack. An affray means something like a mutual contest, suddenly excited, without any apparent intention to do any great bodily harm. . . . yet it seems certain that in some cases there may be an affray where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, and is strictly prohibited by the statute.

Francis Whartson, A Treatise on the Criminal Law of the United States 527 (1874).  In this context, the Common Law's definition of "dangerous" was any item that could be used to take human life through physical force.  For instance, "showing weapons calculated to take life, such as pistols or dirks, putting [the victim] in fear of his life . . . is . . . the use of dangerous weapons." *United States v. Hare*, 26 F. Cas. 148, 163-64 (C.C.D. Md. 1818).  "Unusual" meant to use a protected arm in a manner which creates an affray. Timothy Cunningham's legal dictionary defined an affray as "to affright, and it formerly meant no more, as where persons appeared with armour or weapons not usually worn, to the terror." 1 Timothy Cunningham, A New and Complete Law Dictionary (1771).  An unusual use of common weapons was at issue in *Baron Snigge v. Shirton* 79 E.R. 173 (1607).  In the midst of a landlord-tenant dispute, the tenant "kept the possession [of the house] with drum, guns, and halberts."  *Id.* Despite the weapons being commonly found, the Court ruled the tenant used "unusual weapons" to maintain possession of the house.  *Id. Rex v. Rowland Phillips* 98 E.R. (1385) held "if an officer in the impress service, fire in the usual manner at the hallyaras of a boat, in order to bring her to, and happen to kill a man it is only manslaughter."  *Id.*

*Heller* offered that its test for what arms are protected by the Second Amendment is "supported by" the prohibition on the carriage of dangerous and unusual weapons, *Heller*, 554 U.S. at 627 (citations omitted), but that is not to say the two concepts—the scope of the arms protected by the Second Amendment, and the "dangerous and unusual" doctrine—are identical. They are very different.

As the sources *Heller* cited indicate, the longstanding prohibition on the carrying of "dangerous and unusual weapons" does not, in fact, refer to types of weapons, but to types of conduct with weapons.  A necessary element of the common law crime of affray, to which the

"dangerous and unusual" prohibition refers, has always been that the arms be used or carried in such manner as to terrorize the population, rather than in the manner suitable for ordinary self-defense.

*Heller*'s first source on the topic, Blackstone, offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land*." 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 148-49 (1769) (emphasis added). Blackstone referenced a 1328 Statute of Northampton, which, by the time of the American Revolution, English courts had long limited to prohibit the carrying of arms only with evil intent, "in order to preserve the common law principle of allowing 'Gentlemen to ride armed for their Security.'" David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, 4 DET. L. C. REV. 789, 795 (1982) (citing *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)). "[N]o wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people," by causing "suspicion of an intention to commit an[ ] act of violence or disturbance of the peace." 1 WILLIAM HAWKINS, TREATISE ON THE PLEAS OF THE CROWN, ch. 63, § 9 (Leach ed., 6th ed. 1788); *See also* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994).

*Heller*'s additional citations regarding the "dangerous and unusual" doctrine are in accord. "[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people*." 3 JAMES WILSON, WORKS OF THE HONOURABLE JAMES WILSON 79 (Bird Wilson ed., 1804) (emphasis added). "It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, *in such manner as will naturally*

*cause terror to the people.*" JOHN A. DUNLAP, THE NEW YORK JUSTICE 8 (1815) (emphasis added).

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land . . . . But here it should be remembered, that in this country the constitution guaran[]ties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822) (emphasis added); *See also Heller*, 554 U.S. at 588 n.10 (quoting same). It is the *manner* of how the right is exercised, not the type of weapon that is carried that constitutes the crime. At no point is a test referred to regarding the commonality of the usage of the weapons carried. Said another way, just because a firearm or other weapon is in common usage at the time does not make the *manner* in which the right is exercised excused or excusable simply due to the type of firearm or weapon carried.

"[T]here may be an affray . . . where persons arm themselves with dangerous and unusual weapons, in such manner as will naturally cause a terror to the people." 1 WILLIAM OLDNALL RUSSELL, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271 (1826). But,

> it has been holden, that no wearing of arms is within [the meaning of the Statute of Northampton] unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that persons of quality are in no danger of offending against the statute by wearing common weapons . . . in such places, and upon such occasions, in which it is the common fashion to make use of them, without causing the least suspicion of an intention to commit any act of violence, or disturbance of the peace.

*Id*. at 272.

The other treatises *Heller* cites in support of the "dangerous and unusual" doctrine are in accord, as are the cases *Heller* cites. *See O'Neill v. State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an

affray, *and in such manner as to strike terror to the people*") (emphasis added); *State v. Langford*, 10 N.C. (3 Hawks) 381, 383-84 (1824) (affray "when a man arms himself with dangerous and unusual weapons, *in such a manner as will naturally cause a terror to the people*") (emphasis added); *English v. State*, 35 Tex. 473, 476 (1871) (affray "by terrifying the good people of the land").  In fact, one did not even need to be armed with a firearm to commit the crime of affray under the dangerous and unusual doctrine.  *See State v. Lanier*, 71 N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or innocent" depending on whether people alarmed).

In sum, with reference to the "dangerous and unusual" standard, it is the *manner* in which a weapon is carried or used, not the type of weapon that has historically been prohibited.  The Defendants correctly note that *Heller* stated the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.  However, it is clear from the text of the sources cited by *Heller* that the prohibition of "dangerous and unusual" weapons is a mere time, place, manner restriction, not a categorical prohibition on the possession of certain weapons not subject to Second Amendment protection. (Such distinction is similar to the content based regulation versus time, place, manner regulation distinction found in First Amendment free speech jurisprudence, as discussed, *infra*.) Accordingly, in analyzing the machine gun ban under the *Marzzarella* two-step approach, a court ought to analyze the prohibition under the appropriate form of means-ends scrutiny, and not simply stop the test at the first step, as the Defendants urge.

### ii.   **Longstanding Regulations**

The Defendants next argue, "Longstanding State restrictions on the purchase or possession of machine guns demonstrate that bans on fully-automatic weapons are 'derived from

historical regulations.'"  Def.'s Br. in Supp. 18.   Therefore, the Defendants contend that the

twenty-eight year old prohibition on new machine guns is "presumptively lawful," thus requiring

"resolution of Plaintiff's claim at Step One."  Def.'s Br. in Supp. 17.  In other words, the

Defendants argue for the government's ability to claim adverse possession over constitutional

rights by way of longstanding violation of those rights.

The Defendants rest their argument on mere brief dicta in *Heller* mentioning that the

Second Amendment right, like all other rights found in the Constitution, is not unlimited:

> Like most rights, the right secured by the Second Amendment is not unlimited. . .
> . For example, the majority of the 19th-century courts to consider the question
> held that prohibitions on carrying concealed weapons were lawful under the
> Second Amendment or state analogues. . . . [N]othing in our opinion should be
> taken to cast doubt on longstanding prohibitions on the possession of firearms by
> felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive
> places such as schools and government buildings, or laws imposing conditions
> and qualifications on the commercial sale of arms.

*Heller,* 554 U.S. at 626-27 (citations omitted).  The Court further referred to the

mentioned examples as "presumptively lawful regulatory measures."  *Id.* n.26.

By referencing "19th century courts," it is clear that *Heller's* rational for calling

"longstanding prohibitions" to be "presumptively lawful" had more to do with their being

passed during or shortly after the founder era, a time when the original meaning of the

Second Amendment was well understood, than the mere fact that the laws had been on

the book for a prolonged period of time.  After all, "'[it] is revolting to have no better

reason for a rule of law than that so it was laid down in the time of Henry IV.'"  *Bower v.*

*Hardwick*, 478 U.S. 186, 199 (1986) (Blackmun, J., dissenting (quoting Oliver Wendell

Holmes, *The Path of the Law*, 10 HARV. L. REV. 457, 469 (1897))).

To support their contention that 18 U.S.C. § 922(o) is "presumptively lawful," the

Defendants cite twenty-one "early" state laws regulating machine guns. In contrast to the

examples provided by *Heller*, nearly all of the twenty-one state laws that the Defendants cite were passed in the 1920's or 1930, not contemporaneously to the founding era.  Accordingly, the cited statutes shed little light on the scope of the Second Amendment as understood by the founding generation.  Additionally, *Heller* referenced "19th century courts" considering regulations "under the Second Amendment or State analogues."  *Heller*, 554 U.S. at 626.  The Second Amendment was not incorporated against the states by *McDonald* until 2010, long after the cited statutes were enacted, and only nine of the twenty-one states had any Second Amendment analogue.  Thus, the light to be gleamed from the cited statutes as to the scope of the Second Amendment minimal at best.

Furthermore, many of the cited statutes do not even support the proposition the Defendants cite them for.  For instance, amongst the cited statutes are laws in Maryland and Massachusetts that had nothing to do with machine guns, but rather were age restrictions on the sale of firearms in general (Massachusetts having a Second Amendment analogue).  *See* Def.'s Br. in Supp. Ex. 5.  At least two states, New Jersey and North Dakota, merely required a license to purchase a machine gun, and in North Dakota, even that was only required for machine guns in a caliber larger than twenty-two.  *Id.*  At least three states, Michigan, Minnesota, and Rhode Island, (Michigan and Rhode Island having Second Amendment analogues) included in their definition of "machine gun" semi-automatic firearms, which, pursuant to *Heller*, are constitutionally protected.  *See* Def.'s Br. in Supp. Ex. 5.  Yet another seven states, Arkansas, Delaware, Indiana, Iowa, Kansas, Nebraska, and Wisconsin (Arkansas, Indiana, and Kansas having Second Amendment analogues) provide no definition of "machine gun," potentially also having included in their definitions now protected semi-automatic firearms, semi-automatic firearms frequently being considered "machine guns" at the time.  *See* Def.'s Br. in Supp. Ex. 5.

*See also* National Conference of Commissioners on Uniform State Laws, Uniform Machine Gun Act (1932), *available at* http://www.titleii.com/bardwell/1932_uniform_machine_gun_act.txt (establishing a proposed "Uniform Machine Gun Act" for adoption by all states and including in the definition of "machine gun" firearms where rounds can be "semi-automatically discharged from a magazine").  Therefore, the Defendants' Early State Machine Gun Laws exhibit is of little use in determining whether machine guns fall under the ambit of the Second Amendment, especially considering that longstanding laws are, at best, given a "presumption" of constitutionality, not a determination of constitutionality without any analysis whatsoever.[6]

Indeed, even with the cited statutes in place, in the debate over the NFA, then Attorney General Cummings opinioned that "if we made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved."  National Firearms Act:  Hearings before the House Committee on Ways and Means, 73rd Cong., 2d Sess., 19 (1934).  Accordingly, machine guns fall under the ambit of the Second Amendment, and it is necessary to analyze the challenged statutes under some form of means-ends scrutiny as urged by *Marzzarella*.

---

[6] In fact, while the Defendants contend that the information provided in their Exhibit shows that the machine gun ban is presumptively lawful, it is perhaps the information missing that provides the greatest insight.  While there were forty-eight states in the Union in 1934, thirty-three having Second Amendment analogues, the Defendants have merely cited twenty-one, only nine of which had a Second Amendment analogue, as in any way restricting machine gun possession.  *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms,* 11 TEX. REV. L. & POL. 191 (2006) (discussing state Second Amendment analogues).  Even ignoring all above mentioned peculiarities with the cited statutes, supposed machine gun restrictions appeared in twelve of the fifteen states without a Second Amendment analogue but only nine of the thirty-three with a Second Amendment analogue.  Thus, according to the Defendants' assertions, while more than three quarters of states without a Second Amendment analogue had some sort of machine gun restriction, barely a quarter of states with a Second Amendment analogue restricted machine guns in any manner.  The numbers become even striking when factoring in the above issues.  Assuming machine guns to be as "dangerous and unusual" and as monumental a threat to public safety as the Defendants claim, one can only assume that the drastic disparity between the percentages of states without Second Amendment analogues and those with an analogue restricting machine guns is the Second Amendment.

C.     **Strict Scrutiny Applies**

Although stating that in analyzing Second Amendment challenges, a court will have to employ "some form of means-ends scrutiny," neither *Marzzarella* nor *Heller* laid out what level of scrutiny applies.  *Marzzarella,* 614 F.3d at 89.  *See also Heller,* 554 U.S. at 628 (stating that the challenged laws would be unconstitutional "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights").  Rather, the Supreme Court left the question for another day, but did eliminate the rational basis standard as an option.  *Id.* n.27 ("Obviously, the same test [rational basis] could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms.").  However, not all is lost, for the Third Circuit, taking a clue from *Heller's* frequent analogizing of the Second Amendment to the First, stated that as *Heller* was the first Supreme Court case to address the scope of the right to keep and bear arms, "we look to other constitutional areas for guidance in evaluating Second Amendment challenges.  We think the First Amendment is the natural choice."  *Marzzarella*, 614 F. 3d at n.4.

Accordingly, a review of well-established First Amendment jurisprudence is necessary.  As *Marzzarella* noted, "[r]easonable time, place, and manner restrictions are allowed, but any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest."  *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (internal citations omitted).  While reasonable time, place, and manner restrictions are permitted, they still must survive intermediate scrutiny, i.e. they must be "justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative

channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal citations omitted).

The question at bar thus becomes whether 18 U.S.C. § 922(o)'s categorical prohibition on the possession of machine guns is a content based regulation or a time, place, manner restriction. There can be no doubt that it is a content based regulation.  The challenged statute does not prohibit a person from carrying a machine gun at any particular time, place, or manner.  Rather, it categorically prohibits a person from possessing a machine gun based upon a characteristic of that firearm.  Much as a regulation outright prohibiting an individual from speaking of machine guns, but not semi-automatic firearms, would be a content based regulation, 18 U.S.C. § 922(o)'s prohibition on an individual from possessing a machine gun, but not a semi-automatic firearm, is a content based regulation.  Accordingly, the Court should analyze the statute under strict scrutiny.

### D.      18 U.S.C. § 922(o) Does Not Survive Strict Scrutiny

In order for a statute to survive strict scrutiny, it must be "necessary to serve a compelling [governmental] interest and [be] narrowly drawn to achieve that end." *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*, 502 U.S. 105, 118 (1991) (quoting *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987)).  Strict scrutiny is such a significant hurdle for the government to overcome that it is often characterized as "strict in name, but fatal in practice."  *Strict Scrutiny*, CORNELL UNIVERSITY LAW SCHOOL, http://www.law.cornell.edu/wex/strict_scrutiny.

The prohibition on machine guns is not "necessary" to effectuate a "compelling" governmental interest.  The Defendants advance "public safety and combating crime" as the "compelling governmental interests" at play here.  Def.'s Br. in Supp. 26.  Notably absent from

the Defendants' Brief is any discussion whatsoever as to how exactly the machine gun ban advances the supposed governmental interest of "public safety and combating crime."  It is telling that the governmental Defendants, with all of the resources and statistical analysis available to them, did not cite a single statistic to support the contention that machine guns are "dangerous" or that their prohibition reduces crime.  Indeed, prior to the enactment of 18 U.S.C. § 922(o), then BATFE Director Stephen E. Higgins stated, "machine guns which are involved in crimes are so minimal so as not to be considered a law enforcement problem."  *Armor Piercing Ammunition and the Criminal Misuse and Availability of Machinguns and Silencers: Hearings on H.R. 641 and Related Bills before the Subcomm. On Crime of the House Co. on the Judiciary,* 98th Cong. 208 (1986).  Certainly if machine gun crime is so minimal so as to not even be of concern to law enforcement, then the prohibition of new machine guns cannot be said to be "necessary" to combating crime.

Making it a crime to possess a machine gun will not deter any criminal from committing criminal acts, especially in light of the fact that other firearms such as semi-automatic handguns remain legal (and by the Defendants' own argument are better than machine guns as they are "easier to hold and control").  Def.'s Br. in Supp. 23.  Indeed, handguns make up nearly 90% of all criminal firearm violence year after year.  Michael Planty and Jennifer L. Truman, *Firearm Violence, 1993-2011*, U.S. DEPARTMENT OF JUSTICE 3 (May, 2013) (attached as Ex. "B").  If handguns, which are overwhelmingly the firearm of choice for criminals, are constitutionally protected per *Heller* despite any public safety or crime prevention concerns, how can it be said that a prohibition on machine guns is necessary to achieving that same end?

Furthermore, 18 U.S.C. § 922(o)'s outright prohibition on the possession of post-1986 machine guns is in no way narrowly tailored.  Even assuming, *arguendo*, that machine guns are a

crime problem and their regulation is necessary to achieve a compelling governmental interest, the Defendants have not presented any argument or evidence as to why an outright prohibition on machine guns is necessary.  For instance, the Defendants have not presented any arguments as to why requiring the same background checks and other transfer requirements as are imposed on other firearms would not also meet the government's objectives while still permitting law-abiding citizens to possess the weapons.

### E.        Even if Intermediate Scrutiny Applies, 18 U.S.C. § 922(o) Still Fails

Even if only the intermediate scrutiny standard is applied, as encouraged by the Defendants, the challenged regulations still do not pass muster.  In the First Amendment context, a regulation will survive intermediate scrutiny only if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 662 (1994) (quoting *United States v. O'Brien,* 391 U.S. 367, 377 (1968)).

While there are a number of different ways to state the intermediate scrutiny standard, "They all require the asserted governmental end to be more that just legitimate, either 'significant,' 'substantial,' or 'important.'" *Marzzarella*, 614 F.3d at 98.  While the standard "generally require[s] the fit between the challenged regulation and the asserted objective to be reasonable, not perfect," *Id.*, the burden of proving a "reasonable fit" or a "substantial relationship" between the ban and a "significant, substantial, or important" government objective rests with the government, *United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir.2013) (citing *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010)).  To meet its burden, the government must demonstrate that the law is likely to advance its interest "to a material degree."

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996).  The government's "burden is not satisfied by mere speculation or conjecture;" instead, it "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001).

As stated above with respect to the analysis of 18 U.S.C. § 922(o) under strict scrutiny, the Defendants have failed to provide any evidence of the ban on machine guns advancing the claimed governmental interest of "[p]rotecting public safety and combating crime."  Rather than cite any of the voluminous statistics within the governments library which would undoubtedly exist if the Defendants' claims of the dangerousness of machine guns were true, the Defendants merely quote a number of individuals stating that machine guns are "primarily weapons of war," "serve[] virtually no purpose other than the furtherance of illegal activity," and "used almost exclusively by criminals."  Def.'s Br. in Supp. 24-26 (citations omitted).  While mere quotes might suffice in a barroom policy debate, more support is required to survive intermediate scrutiny.

Indeed, when looking at the actual evidence available, it is clear that the ban on machine guns does not advance "to a material degree" the government's claimed interest in "[p]romoting public safety and combating crime."  The simple facts support Defendant B. Todd Jones' predecessor, Stephen E. Higgins', statements made contemporaneously with the enactment of the machine gun ban that "These weapons are held by collectors and others; only rarely do they figure in violent crime," and "machineguns which are involved in crimes are so minimal so as not to be considered a law enforcement problem."  *Armor Piercing Ammunition and the Criminal Misuse and Availability of Machinguns and Silencers: Hearings on H.R. 641 and*

*Related Bills before the Subcomm. On Crime of the House Co. on the Judiciary,* 98th Cong. 111, 208 (1986).

As of September 30, 1984, there were 105,125 registered machine guns with 84,626 registered to private individuals or businesses. *Id.* at 118. By 1995, there were 240,000 machine guns registered. Marianne W. Zawitz, *Guns Used in Crime*, U.S. DEPARTMENT OF JUSTICE 4 (July 1995) (attached as Ex. "C"). Yet somehow, despite the contentions that machine guns are "used almost exclusively by criminals" and "serve[] virtually no purpose other than the furtherance of illegal activity," only two of those firearms have ever been used in a crime. Indeed, according to the Bureau of Justice Statistics, in 1994, out of over 84,000 criminal firearms trace requests submitted to the BATFE, only 0.1% involved firearms placed in the category of "other including machineguns." *Id.*

In fact, it is not machine guns that are "peculiarly adaptable to use by criminals in the pursuit of their criminal activities," but rather the unequivocally constitutionally protected handgun. Def.'s Br. in Supp. 25 (quoting *Rinzler v. Carson*, 262 So.2d 666 (Fla. 1972)). It is handguns that year after year are used in nearly 90% of all violent crimes involving firearms. Planty, Ex. "B" at 3. Yet despite the majority of firearms crimes, including homicides, being committed with handguns, *Heller* protected that category of firearm. *See also Moore v. Madigan*, 702 F.3d 933, 939 (7th Cir. 2012) (the "mere possibility" that a gun control law may save lives is not enough and "*Heller* would have been decided the other way" if it were).

With the chosen weapon of criminals being unquestionably constitutionally protected, the Defendants do not even attempt to explain how the machine gun ban in any manner advances the claimed governmental interest of reducing crime. It defies logic to assume that prohibiting machine guns, while permitting handguns, will prevent criminals from obtaining firearms and

using them in criminal manners especially in light of the fact that criminals prefer "easily concealable" firearms, not rifles such as the M-16 at issue in the present case.  Zawitz, Ex. "C" at 2.  Accordingly, even under the more deferential intermediate scrutiny standard, 18 U.S.C. § 922(o) fails.

## III.    Article I - Interstate Commerce Clause

The Defendants rely on *Gonzales v. Raich*, 545 U.S. 1 (2005) to support their contention that 18 U.S.C. § 922(o)'s ban on machine guns, including the wholly intrastate, non-commercial manufacture, was enacted pursuant to Congress' Interstate Commerce powers.  Def.'s Br. in Supp. 26-29.  In *Raich,* the Supreme Court held that the Interstate Commerce Clause permits Congress to "regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity."  *Raich*, 545 U.S. at 18.

*Raich* dealt with Congress' prohibition of the wholly intrastate, non-commercial manufacture of marijuana as part of the larger regulatory goal to prohibit the interstate trade in drugs as enacted in the Controlled Substances Act ("CSA").  *Id.* at 12-14.  Noting that Congress has the authority to prohibit the drug trade, the Court found that the failure to prohibit the wholly intrastate manufacture of marijuana could undermine Congress' attempt to prohibit the interstate trade of drugs, and therefore the prohibition of non-commercial wholly intrastate marijuana production fell under Congress' Interstate Commerce Powers.  *Id*. at 22.  ("We have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA.").

Unlike in *Raich* where the Court found it within Congress' authority to prohibit drugs, *Heller* declared beyond a doubt that Congress cannot outright prohibit firearms.  *District of*

*Columbia v. Heller*, 554 U.S. 570, 636 (2008).  Accordingly, there is no larger regulatory scheme such as the CSA for which 18 U.S.C. § 922(o) is an essential part and without Congress' prohibiting the intrastate non-commercial manufacture of machine guns, the regulatory scheme would be undercut.

The Defendants argue that the larger regulatory scheme at play is Congress' concern "with keeping firearms 'out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'"  Def.'s Br. in Supp. 29 (quoting S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2113-14).  However, nowhere in their Brief do the Defendants explain how prohibiting law abiding citizens from manufacturing and possessing machine guns would undermine Congress' efforts to keep firearms in general away from those not entitled to possess them.  Nor has Congress initiated any findings to that effect.  Quite simply, absent the ability to prohibit all firearms, which is of course unconstitutional, Congress' prohibiting law abiding citizens from possessing a certain category of firearms it finds objectionable will have no effect on prohibited persons obtaining firearms.  Consequently, there is no basis to conclude that failure to prohibit the wholly intrastate non-commercial manufacture of machine guns would undercut Congress' goal of "keeping firearms out of the hands of those not legally entitled to possess them."

Furthermore, even *Raich* held that for Congress to have authority to regulate an activity on the basis of a substantial effect on interstate commerce, there must at least be a rational basis for concluding that the regulated activity does in fact have a substantial effect on interstate commerce.  *Id.* at 22.  With respect to the 1986 prohibition on the new manufacture of machine guns, Congress not only failed to make any findings that machine guns have any effect whatsoever on interstate commerce, but the only evidence on the effect of machine guns on

interstate commerce was from then ATF Director Stephen E. Higgins who stated that "machine guns which are involved in crimes are so minimal so as not to be considered a law enforcement problem." *Armor Piercing Ammunition and the Criminal Misuse and Availability of Machinguns and Silencers: Hearings on H.R. 641 and Related Bills Before the Subcomm. On Crime of the House Co. on the Judiciary,* 98th Cong. 208 (1986).

While Congress is accorded deference in its determination of whether an activity has a substantial effect on interstate commerce, surely it cannot be considered rational to conclude that machine guns have a substantial effect of commerce when the only evidence before Congress has been credible testimony from the Director of the BATFE that machine guns have no effect whatsoever. To allow Congress to decide otherwise turns the Interstate Commerce Clause into the unlimited grant of power that effectively revokes our federalist system of governance that the Supreme Court has warned against. *See U.S. v. Lopez*, 514 U.S. 549, 565 ("Under the theories that the Government presents . . . it is difficult to perceive any limitation on federal power.").

## IV.    Due Process

The Defendants contend that their summarily revoking Plaintiff's approval to manufacture a machine gun and confiscating said firearm did not violate due process concerns. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests." *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976). The Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived of a property interest." *Id.* at 333.

The Defendants argue that Plaintiff is not entitled to any due process because Plaintiff has no protected property interest in the machine gun at issue or in the approved Form 1 application. Def.'s Br. in Supp. 30-34. Accordingly, the Defendants contend they could summarily revoke

Plaintiff's authority to manufacture a machine gun and confiscate the already manufactured firearm without invoking constitutional due process concerns. *Id.  Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998) is cited for the principle that "procedural due process is implicated only where someone has claimed that there has been a . . . deprivation of a legally protected . . . property interest." Def.'s Br. in Supp. 30. Because the GCA "prohibits any person from possessing a machine gun," the Defendants contend that Plaintiff does not have a "legitimate claim of entitlement" to the manufactured firearm or the approved application. *Id.* at 31.

What the Defendants have overlooked in their Brief is that Plaintiff brought the present suit as an individual and as trustee of the Watson Family Gun Trust. It was indeed the trust that was approved to manufacture a machine gun. *See* Comp. Ex. "B". The distinction is not trivial as 18 U.S.C. § 922(o) only prohibits a "person" from manufacturing or possessing a post-1986 machine gun as "person" is defined in the GCA as an "individual, corporation, company, association, firm, partnership, society, or joint stock company." 18 U.S.C. § 921(a)(1). The definition of "person" in the GCA is in contrast to that in the NFA, which gains its definition from the general definition of "person" in the Internal Revenue Code of "an individual, trust, estate, partnership, association, company, or corporation." 26 U.S.C. § 7701(a)(1).

The distinction requires that the GCA and NFA not be comingled and how the two provisions interact be properly understood. The National Firearms Act, enacted in 1934, enacted certain requirements for the manufacture and transfer of certain types of firearms, including machine guns. Namely, a "person" (the NFA includes a trust in this definition) must submit an application to the ATF, obtain ATF approval, and pay a $200 tax before manufacturing a firearm

subject to the Act's provisions, such as a machine gun.  26 U.S.C 5822.[7]  18 U.S.C. § 922(o),

enacted in 1986, did not in any way alter the NFA, but rather prohibited a "person" (not

including a trust in the definition) from possessing a machine gun manufactured after 1986.  As

it is not subject to the provisions of 18 U.S.C. § 922(o) under the plain language of the law, a

trust is permitted to manufacture or possess a machine gun manufactured after 1986, so long as

the trust complies with the provisions of the NFA.  Indeed, the Defendants, in stating that the

"definition of 'person' under the NFA therefore includes 'trusts,' while the GCA definition does

not include this term," admit that the Plaintiff trust is not prohibited by law from possessing a

post-1986 machine gun.  Def.'s Br. in Supp. 5.

Because the Plaintiff trust is not prohibited from possessing a machine gun manufactured

after 1986, Plaintiff does in fact have a "legitimate claim of entitlement" to the confiscated

firearm.  Additionally, Plaintiff has a "legitimate claim of entitlement" to the wrongfully revoked

approved Form 1 to manufacture the machine gun as Plaintiff fully complied with all applicable

laws and there was therefore no legal basis for the Defendants to deny the application or deny the

Form 1 after having been approved.   Furthermore, the Defendants focus their inquiry wholly on

the machine gun, and not on the AR-15 lower receiver that Plaintiff lawfully owned, which was

arbitrarily confiscated by the Defendants after being legally converted into a machine gun.  The

Defendants do not argue, nor would it be reasonable for them to argue, that Plaintiff did not have

a "legitimate claim of entitlement" to that property.

The Defendants argue further that since any subsequent transfers of the machine gun by

Plaintiff would require the transferee to submit his own application and obtain approval from the

ATF pursuant to the NFA, Plaintiff had no property interest in the machine gun as it lacked the

---

[7] While the NFA does include a trust in the definition of person, the act still distinguishes a trust from an individual by imposing the additional requirement that an individual, but not a trust, submit fingerprints and the individual's photograph.  26 U.S.C. § 5822.

"entitlements to 'to [sic] possess, use, exclude, profit, and dispose' that are generally included in 'the concept of 'property.'"  Def.'s Br. in Supp. 33 (quoting *United States v. Frost*, 125 F. 3d 346 (6th Cir. 1997)).  The Defendants' analysis that the Plaintiff would not be able to "dispose" of the machine gun without the Defendants' approval leaves out the fact that Plaintiff most certainly could possess and use the machine gun and exclude others from its use without any further intervention or approval from the Defendants or any other governmental body.  Accordingly, Plaintiff had a protectable property interest in the firearm and the approved Form 1.

Despite claiming Plaintiff was not entitled to any measure of due process, the Defendants attempt to argue that Plaintiff was indeed afforded due process.  Def.'s Br. in Supp. n.21. According to the Defendants, the "ATF's rapid reversal of the error within 48 hours . . . and the limited effort required to submit a new ATF Form 1 if Plaintiff believed ATF's decision to be in error, demonstrate that the opportunity for Plaintiff to reapply to ATF constitutes sufficient due process."  *Id.*  First, it should be noted that the ATF's "error" was not "corrected" within 48 hours, but rather the first notification to Plaintiff of the reversal was sent via email dated September 10, 2014 when the approval was sent to Plaintiff on August 5, 2014.[8]  Second, it is at best laughable to consider the opportunity to reapply to the ATF to manufacture another machine gun after receiving multiple letters from the ATF informing Plaintiff that such an application would not be approved to satisfy due process for the Defendants' revoking Plaintiff's authority to make a machine gun and subsequently confiscating the already manufactured firearm.

As Plaintiff had a property interest in the confiscated firearm and the underlying application to manufacture said firearm, and said property was confiscated from Plaintiff without

---

[8] The Defendants' stating the "error" was reversed within 48 hours is presumably a mere oversight in the drafting of the Brief as those facts support the similar litigation to this suit brought in the Northern District of Texas under Case Number 3:14-cv-03872 to which the Defendants submitted a similar Brief at the same time the Brief in the present matter was filed.

any due process nor just compensation as required by the Fifth Amendment to the United States Constitution, Plaintiff has sufficiently plead a Fifth Amendment claim for relief.

## V.    Equal Protection

The Defendants argue that Plaintiff's equal protection claims should be dismissed.  Def.'s Br. in Supp. 34-36.  In the Complaint, Plaintiff alleges that other individuals have been granted permission by the Defendants to manufacture and possess post-1986 machine guns, namely civilian companies and their employees, firearms dealers and their employees who possess "samples", and various individuals, none of which are provided with an exception to 18 U.S.C. § 922(o) that would not apply to Plaintiff.  Comp. ¶¶ 30-31.

The Defendants contend that since Plaintiff's claimed equal protection violation "neither burdens a fundamental right nor targets a suspect class," the "equal protection claim must be evaluated under rational basis scrutiny."  Def.'s Br. in Supp. 34-35 (citing *Vacco v. Quill*, 521 U.S. 793, 799 (1997).  However, the right to keep and bear arms has been held by the Supreme Court to be a fundamental right.  *McDonald*, 561 U.S. at 778 (stating "it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty").  Accordingly, the proper standard is strict scrutiny, and the Defendants must show a compelling interest for the disparate treatment between Plaintiff and others who have been approved to manufacture machine guns by the Defendants.  Plaintiff's allegations are certainly sufficient to survive the Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) or in the alternative, Motion for Summary Judgment.

Nonetheless, despite the Defendants' assertions otherwise, even if Plaintiff's claim is merely subject to a rational basis standard of review, Plaintiff has met the Pleading requirements set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544 (2007).  A Plaintiff need not plead "detailed factual allegations."  *Id.* at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)).  Rather, "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Plaintiff has plead sufficient factual matter to "state a claim to relief that is plausible on its face."  Accepting as true Plaintiff's allegations that others who under the Defendants' interpretation of 18 U.S.C. § 922(o) are equally prohibited from manufacturing or possessing machine guns have been permitted by the Defendants to manufacture and possess machine guns, Plaintiff has sufficiently stated an equal protection claim through the Fifth Amendment's Due Process Clause.  Accordingly, Plaintiff has sufficiently met the standard established in *Twombly and Iqbal* to survive the Defendants' Motion to Dismiss and Motion for Summary Judgment.

## VI.    Detrimental Reliance

Lastly, the Defendants request this Court to dismiss Plaintiff's detrimental reliance claim.  For a Plaintiff to succeed on an equitable estoppel claim, he "must prove (1) a misrepresentation by another party; (2) which he reasonable relied upon; (3) to his detriment."  *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir. 1987).  The Defendants also note that "a litigant must prove 'affirmative misconduct' to succeed on an estoppel claim against the government."  Def.'s Br. in Supp. 37 (quoting *Asmar,* 827 F.2d at 912).

The Defendants first contend that there was no "misrepresentation" on their part let alone "affirmative misconduct" such as to give rise to a detrimental reliance claim.  Def.'s Br. in Supp. 37.  To this end, the Defendants routinely refer to Plaintiff's Form 1 application as merely being

approved by one examiner's "mistake" or "error."  *See* Def.'s Br. in Supp. 2, 6, 30, 32, 34, 36,

and 37.  The contention that Plaintiff's application was approved by simple "mistake" or "error"

is fictitious at best.  While the Defendants readily acknowledge that Plaintiff had one Form 1

approved by ATF examiner Shannon Siverio, *see* Comp. Ex. "B," the Defendants fail to

acknowledge that Plaintiff had a second Form 1 application clearly approved by ATF examiner

Brittany Brown then whited out, disapproved, and returned to Plaintiff, *see* Watson Aff., Ex.

"A".  Additionally, the Defendants fail to acknowledge pending legislation in the Northern

District of Texas under Case Number 3:14-cv-03872 involving another Plaintiff whose Form 1

application was approved under similar circumstances by an additional ATF Examiner.[9]  Three

documented applications approved by three different ATF examiners is a far cry from a single

"ATF examiner who mistakenly approved Plaintiff's application to make a machine gun act[ing]

in error."  Def.'s Br. in Supp. 37.

     Quite clearly, the Defendants had a concerted plan of action to approve Form 1

applications such as Plaintiff's which were submitted by trusts (presumably in agreement with

Plaintiff's contention that the ATF must approve "applications if made by . . . an unincorporated

trust" pursuant to the plain language of 18 U.S.C. § 922(o), Def.'s Br. in Supp. 6) and later

changed course.  While the Defendants contend that there was no "misconduct" on their part,

they acknowledge that federal law and the "ATF's implementing regulation, 27 C.F.R. § 479.65,

provide[] that an application to make a firearm shall not be approved by ATF if the making or

possession of the firearm 'would place the person making the firearm in violation of law,'

including in violation of the provisions of the NFA."  Def.'s Br. in Supp. 4 (citing 27 C.F.R. §

479.65 and 26 U.S.C. § 5861(f)).  The Defendants' argue that Plaintiff's manufacture and

_____

[9] Plaintiff is unable to decipher the signature on that form, however it is clear that it is not that of Shannon Siverio or Brittany Brown.

possession of a machine gun is in violation of the GCA and NFA, meaning that by their own admission, the Defendants violated federal law and even their own regulations in approving two of Plaintiff's applications and the third application subject to litigation in Texas.  Can it really be said that a government agency's contention that it blatantly violated federal law, not once, but three times via three different agents is not "affirmative misconduct?"

The Defendants essentially end their detrimental reliance analysis at the first prong of the test, but merely question in a footnote whether Plaintiff's reliance on the Defendant's approval of his application was reasonable pursuant to the second prong of the test.  Def.'s Br. in Supp. n.22 ("it is questionable whether Plaintiff has demonstrated that any reliance he placed on the approval of the application was reasonable").  In other words, the Defendants contend that it is not reasonable for a law abiding citizen of the United States to rely on an official governmental determination that his proposed actions will not be in violation of law (when that agency's function is determining compliance with the law), perhaps perfectly demonstrating the importance of strenuously protecting Second Amendment rights at this juncture!

Rather, the Defendants rely on an easily distinguishable holding from the D.C. Circuit in *Vollmer Co. v. Higgins,* 23 F.3d 448 (1994).  In that case, the Plaintiff made a claim for equitable estoppel against the government based upon a letter from the ATF that the Plaintiff interpreted to advise that Plaintiff could convert a semi-automatic firearm receiver into fully automatic configuration.  *Id.* at 450.  The Court denied the estoppel claim noting that the "letter did not directly mention receiver modifications."  *Id.*

In the case at bar, the Plaintiff did not rely upon a mere "letter" which did not even contain the information Plaintiff contends it did.  Rather, Plaintiff relied upon an official approval by the Defendants of Plaintiff's Form 1 application that granted him legal authority to

manufacture a machine gun and that the Defendants are prohibited by federal statute and their own regulations from approving if the proposed manufacturing would place Plaintiff in violation of law.  26 U.S.C § 5822 and 27 C.F.R. § 479.65.  Surely one has a greater basis to rely upon an official approval granting authority to manufacture a machine gun then one's misinterpretation of a mere unofficial letter that conferred no authority whatsoever.

Nonetheless, the Defendants also attempt to claim that equitable estoppel is not applicable against the government when "obedience to the rule of law is undermined."  Def.'s Br. in Supp. 36 (quoting *Heckler v. Cmty. Health Servs.,* 467 U.S. 51, 60 (1984)).  Of course, the Defendants fail to explain how exactly obedience to the rule of law (let alone a law that does not even prohibit Plaintiff's conduct) would be undermined if Plaintiff's detrimental reliance claim were granted.  In fact, not only would granting Plaintiff's requested relief under his detrimental reliance claim not undermine "obedience to the rule of law," but the Defendants even have explicit legal authority to grant such relief.  27 C.F.R. § 479.101 (b) provides that even an unlawfully possessed machine gun can be registered under the NFA "during an amnesty period established under Section 207 of the Gun Control Act of 1968."  Section 207 provides that "The Secretary of the Treasury . . . is authorized to establish such periods of amnesty."  82 Stat. 1235.

Ironically, the *Vollmer* opinion, upon which the Defendants so heavily rely, makes note of a time in which the ATF did in fact allow the registration of firearms that were "mistakenly" approved by the ATF.  *Vollmer* 23 F.3d at 450-51.  In that instance, the ATF registered nearly 16,000 machine gun conversion kits which it later found were not eligible for registration under 18 U.S.C. § 922(o).  *Id.*  However by the time the ATF realized its "error," many of the kits had already been sold to innocent purchasers or installed in firearms by dealers.  *Id.*  Ultimately, the

ATF permitted the continued registration and possession of the effected firearms by the innocent purchasers and dealers who had in good faith relied upon the ATF's approval.  *Id.*

Plaintiff has thus sufficiently alleged a claim for detrimental reliance.

## CONCLUSION

The Defendants' contentions lack merit and accordingly, Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment should be denied.  First, Plaintiff does not lack standing due to traceability or redressability requirements because Plaintiff's injury was directly caused by the Defendants and the challenged regulations.  Second, each of Plaintiff's claims are sufficient to survive the Defendants' Motion to Dismiss and Motion for Summary Judgment as outlined herein.   Finally, the Defendants have made no argument against Plaintiff's last prayer for relief for "a declaration that 18 U.S.C. § 922(o) does not prohibit unincorporated trusts from manufacturing or possessing machine guns . . ."  Comp. Prayer for Relief ¶ 7.  Indeed, noticeably absent from the Defendants' Brief is any discussion whatsoever of the specific action that gave rise to the present suit in the first place, i.e. how exactly the ATF contends that 18 U.S.C. § 922(o) prohibits an unincorporated trust from manufacturing or possessing a post-1986 machine gun when by the Defendants' own admission, the statute does not.

As *Heller* stated, "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."  *Heller*, 554 U.S. at 634.  Yet that is precisely what the Defendants have asked this Court to do.


This, 30th day of January, 2015.

Respectfully submitted,


 /s/ David R. Scott_____
DAVID R. SCOTT, ESQUIRE
ATTORNEY FOR PLAINTIFF


David R. Scott
Law Offices of J. Scott Watson, P.C.
24 Regency Plaza
Glen Mills, PA  19342
(610) 358-9600
PA Bar No. 313491

## <u>CERTIFICATE OF SERVICE</u>

I herby certify that I, David R. Scott, electronically submitted the forgoing documents with the clerk of court for the U.S. District Court, Eastern District of Pennsylvania, using the electronic case filing system of the court on January 30, 2015.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2) or the local rules.

<u>/s/ David R. Scott</u>
David R. Scott