## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RYAN S. WATSON, individually and as<br>Trustee of the Watson Family Gun Trust,<br><br>    Plaintiff,<br><br>         v.<br><br>ERIC H. HOLDER, JR., Attorney General of the<br>United States, and B. TODD JONES, Director,<br>Bureau of Alcohol, Tobacco, Firearms &<br>Explosives,<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 2:14-cv-6569-SD |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
## OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

In their opening brief in support of their motion to dismiss, ECF No. 10-1, Defendants

anticipated and addressed many of the points raised in Plaintiff's opposition, ECF No. 13, and

Defendants therefore substantially rest on that brief.  Mindful as well that the Court "disfavors

reply briefs," Defendants hereby address this reply only to those issues as to which they

anticipate the Court will find additional analysis and precedent to be helpful.[1]

> **A.**     **Plaintiff Has Conceded That He Lacks Standing to Proceed With His
> Commerce Clause Challenge, and His Standing Arguments Are Foreclosed
> by Clearly-Established Precedent.**

As explained in Defendants' opening brief, Plaintiff cannot establish traceability or

redressability for his claims under the Second Amendment or the Commerce Clause because

Pennsylvania law independently prohibits his possession of a machine gun and Plaintiff has not

sued Pennsylvania.  *See* ECF No. 10-1 at 9-10 ("Def's Br.").  Plaintiff's response is to suggest as

a matter of logic that, "should the Court declare machine guns protected under the Second

---

[1] To the extent that the Court may wish Defendants to further address any other issues, Defendants are prepared to
do so at oral argument or through filing a supplemental brief at the direction of the Court.

Amendment . . . [the] Pennsylvania prohibition on machine guns would also be unconstitutional."  ECF No. 13 at 8 ("Pl. Br.").  As this quotation makes clear, however, Plaintiff's response is limited to his claims under the Second Amendment and does not address in any way Defendants' argument that Plaintiff's *Commerce Clause* claims (*i.e.*, Count One of his complaint, entitled "Violation of Article I of the United States Constitution") cannot be redressed in this action.  *See* Def's Br. 8-10.  Article III requires that "a plaintiff who raises multiple causes of action must demonstrate standing for each," *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 360 (3d Cir. 2014), and because Plaintiff has not responded to Defendants' argument that he lacks standing for his first cause of action, he has waived his opportunity to do so.  *See, e.g.*, *Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003) ("Plaintiff makes no response to this argument, and thus has waived his opportunity to contest it.").

Moreover, Plaintiff's suggestion that predictions about the likely fate of the Pennsylvania state statute demonstrates redressability for his Second Amendment claims is ill-founded.  In *McConnell v. FEC*, the Supreme Court rejected the argument that the possible future invalidation of a comparable state statute could supply redressability, and the Third Circuit has adhered to this principle.  *See* 540 U.S. 93, 229 (2003); *Coastal Outdoor Adver. Grp., LLC v. Twp. of E. Hanover*, 397 F. App'x 794, 795 (3d Cir. 2010).  Plaintiff has not sued Pennsylvania, and redressability for Plaintiff's purported Second Amendment "injury" is therefore lacking.[2]

**B.    The Supreme Court Has Specifically Rejected Plaintiff's Novel Argument That the Second Amendment Requires the Government to Permit Ownership of All Militarily-Useful Weapons Transportable by an Individual.**

Plaintiff does not dispute that machine guns have minimal utility for self-defense, which

[2] Success on the merits of Plaintiff's legislative power claim would also have no impact on the Pennsylvania statute: although Congress "possesses only limited powers . . . [t]he States have broad authority to enact legislation for the public good – what we have often called a police power."  *Bond v. United States*, 134 S. Ct. 2077, 2086 (2014) (Roberts, C.J.).  Thus, even if Plaintiff could demonstrate that Congress lacked the authority to regulate machine guns, such a demonstration would cast no doubt on the Commonwealth's ability to do so.

*Heller* explained is the "inherent right . . . central to the Second Amendment right." *Dist. of Columbia v. Heller*, 554 U.S. 570, 628 (2008); *see* Def's Br. 22-24 (explaining that other weapons are "more practical" for self-defense and that the features of machine guns are rarely useful for self-defense). Rather, Plaintiff proposes that the Court adopt a new central purpose of the Second Amendment: to ensure that individuals can "mak[e] large standing armies unnecessary," by possessing any weapon "overwhelmingly chosen by militaries throughout the world for defense of county [*sic*]." Pl. Br. 10-11. This argument, however, is squarely foreclosed by *Heller*. Anticipating an objection that banning useful military weapons (like M-16s) would be inconsistent with the Second Amendment, the Supreme Court explained that such an objection would be meritless:

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."
>
> It may be objected that if weapons that are most useful in military service – M–16 rifles and the like – may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

*Heller*, 554 U.S. at 627 (internal citations omitted).[3]

---

[3] In contrast to *Heller*'s detailed discussion of the exclusion of weapons "useful in military service" from the scope of the right set forth in the operative clause of the Second Amendment, 554 U.S. at 627, the passages relied on by Plaintiff are brief references made in *Heller*'s discussion of the prefatory clause. *See* Pl. Br. at 9-10 (*citing* 554 U.S. at 597-98, 599-600). Nor do these passages support the inference Plaintiff seeks to draw – that preserving the ability to "resist[] tyranny" requires access to any bearable weapon in general military use. Pl. Br. at 9, 11-12. Rather, as the dissenting Ninth Circuit opinion cited by Plaintiff explains, even lesser arms such as "a rifle and twenty bullets apiece, as the Militia Act required," confer immense value in serving this purpose. *Silveira v. Lockyer*, 328 F.3d 567, 569-70 (9th Cir. 2003) (Kozinski, J., dissenting).

As the Third Circuit explained in *United States v. Marzzarella*, the Supreme Court thereby has made clear "the Second Amendment does not protect [short-barreled shotguns and machine guns]." 614 F.3d 94-95 (3d Cir. 2010); *see also Heller,* 554 U.S. at 624-25 (concluding that it would be "startling" if the Second Amendment would "mean that the [NFA]'s restrictions on firearms [] might be unconstitutional"). The logic of Plaintiff's argument extends far beyond M-16 rifles and the like, however: the only qualifier which he suggests *might* limit his postulated right to possess military weaponry is that a weapon be "bearable." Pl. Br. at 12 n.5. Under the broad scope of "bearable" weapons "chosen by militaries" that he therefore contends are protected by the Second Amendment are numerous instruments of dramatic destructive capability such as anti-personnel mines, rocket-propelled grenades ("RPGs"), and even man-portable surface-to-air missiles. Pl. Br. at 12; *see generally* Chris Bishop, *et al.*, The Encyclopedia of Modern Military Weapons at 178, 186 (1999). *Heller*'s discussion of machine guns forecloses such a dramatic rewriting of the scope of the Second Amendment right.[4]

### C.    Congress May Prohibit Dangerous and Unusual Weapons Without Running Afoul of the Second Amendment.

Plaintiff's lengthy analysis of the history of the common law crime of "affray," Pl. Br. 13-17, is irrelevant in light of the controlling conclusions by the Supreme Court and the Third Circuit that "dangerous and unusual weapons" fall outside the ambit of the Second Amendment's protection. As the Court of Appeals has explained:

> the right protected by the Second Amendment is not unlimited. First, it does not extend to all types of weapons, only to those typically possessed by law-abiding citizens for lawful purposes. . . . In *Heller*, the Court explained that "[*United States v.*] *Miller*, 307 U.S. 174 (1939), stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of

---

[4] The same discussions in *Heller*, along with the authorities cited in Defendants' opening brief, demonstrate the error in Plaintiff's supposition that the Second Amendment bars a "categorical ban" on any class of weapons that can be analogized to handguns. *See* Def's Br. at 15-16; *Heller*, 554 U.S. at 623 (noting that *Miller* stands for "the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons").

weapons," – those commonly owned by law-abiding citizens.  This proposition reflected a "historical tradition of prohibiting the carrying of dangerous and unusual weapons."  Accordingly, the right to bear arms, as codified in the Second Amendment, affords no protection to "weapons not typically possessed by law-abiding citizens for lawful purposes."

*Marzzarella*, 614 F.3d at 90-91.  In identifying a "limitation on the right to keep and carry arms" under the Second Amendment, *Heller* looked to historical examples for support, but made clear that the scope of the modern right is not cabined by such historical examples.  *See* 554 U.S. at 627-28; *see also id.* at 582.  Indeed, had *Heller* been so strictly restricted to the historic scope of the right to bear arms, the Supreme Court could not have reached its central holding affirming that a ban on *handguns* – a type of arms "not in existence at the time of the founding" – is incompatible with the Second Amendment.  *Id.* at 582 (rejecting the argument that "only those arms in existence in the 18th century are protected" and emphasizing that the *Heller* opinion would "interpret constitutional rights" in a "modern" way).[5]

Plaintiff's effort to minimize the import of the "[l]ongstanding State restrictions on the purchase or possession of machine guns" set forth in Defendants' opening brief provides no better reason to conclude that machine guns fall within the scope of the Second Amendment's protection.  Def's Br. 18.  As an initial matter, Plaintiff's claim that *Heller*'s discussion of "longstanding prohibitions" is "mere dicta" is irrelevant: the Third Circuit adopted this standard as controlling in *Drake v. Filko*, which upheld New Jersey's handgun permit law "as a presumptively lawful, longstanding regulation [that] therefore does not burden conduct within

---

[5] In any event, other respected historical sources demonstrate that prohibitions on dangerous and unusual weapons did not depend on the manner of how the right is exercised.  *See, e.g.*, Giles Jacob, A New Law Dictionary (7th ed. n.p., Henry Lintot 1756) ("By the Common Law it is an Offence for Persons to go or ride armed with dangerous and unusual Weapons; But Gentlemen may wear common Armour according to their Quality") (entry on "armour and arms"); John N. Pomeroy, An Introduction to the Law of the United States 152 (4th ed. rev. 1879) (Second Amendment "certainly not violated by laws forbidding persons to carry dangerous or concealed weapons").  The prohibitions described by Jacob and Pomeroy likewise illustrate that, even if the only historical regulation of dangerous and unusual weapons involved affrays, a prohibition on possession would likely satisfy the means-end scrutiny applied by the Third Circuit.  *See Marzzarella*, 614 F.3d at 89.

the scope of the Second Amendment's guarantee."  724 F.3d 426, 440 (2013) (internal quotations omitted).  In *Drake*,  the Court of Appeals further explained that *Heller* itself refutes Plaintiff's argument that only "founder era" laws can be longstanding, Pl. Br. at 18-19, explaining that "'*Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet current versions of these bans are of mid-twentieth century vintage.'"  *Id.* at 434 n. 11 (*quoting Nat'l Rifle Ass'n ("NRA") v. ATF*, 700 F.3d 185, 196-97 (5th Cir. 2012)).

> ### D.     First Amendment Doctrines Are Not Incorporated Wholesale Into the Second Amendment, and Therefore Intermediate Scrutiny, Not Strict Scrutiny, Applies to Plaintiff's Claims.

 The Third Circuit has repeatedly rejected efforts to impose outright the standards of the First Amendment in Second Amendment cases.  First, in *United States v. Barton*, the Court held that it would not "recognize an 'overbreadth' doctrine outside the limited context of the First Amendment," thereby preventing a criminal defendant from mounting a facial challenge to the federal felon-dispossession statute.  633 F.3d 168, 172 n.3.  In *Drake*, the Court of Appeals likewise "reject[ed] [an] invitation to apply First Amendment prior restraint doctrine rather than traditional means-end scrutiny" in its Second Amendment review.  724 F.3d 435.  Thus, although the Court recognized in *Marzzarella* that "the structure of First Amendment doctrine should inform [] analysis of the Second," 614 F.3d 89 n.4, that statement merely "reflects [the Third Circuit's] willingness to consider the varying levels of means-end scrutiny applied to First Amendment challenges when determining what level of scrutiny to apply to a Second Amendment challenge." *Drake*, 724 F.3d at 435.

Failing to heed these warnings, Plaintiff incorrectly attempts to shoehorn his Second Amendment challenge into First Amendment doctrines in two principal instances.  First, Plaintiff misinterprets both Amendments in support of his contention that the Court should apply strict scrutiny to his Second Amendment claims because 18 U.S.C. § 922(o) is not "a time, place,

manner restriction" on "possessing a machine gun."  Pl. Br. 22.  The Third Circuit has expressly

decided not to incorporate substantive First Amendment doctrine – such as the distinction

between content-based regulations and time, place, and manner regulations – into the Second

Amendment context.  *See Drake*, 724 F.3d at 436 (ruling out strict scrutiny by distinguishing

"content-based restrictions on speech in a public forum," *i.e.*, "the core of the First Amendment,"

from "the core of the right conferred upon individuals by the Second Amendment . . . to possess

usable handguns *in the home* for self-defense") (emphasis in original).  Other courts have

likewise declined to "import substantive First Amendment" jurisprudence into the Second

Amendment context.  *See, e.g.*, *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 91 (2d Cir.

2012) ("hesitant" to take this step because "no court has done so.").  For this reason, "no court

has ever held . . . that [its] analysis [of a Second Amendment claim] is controlled by the First

Amendment analysis regarding time, place, and manner restrictions."  *Kolbe v. O'Malley*, --- F.

Supp. 2d ---, 2014 WL 4243633, at *15 n.32 (D. Md. Aug. 22, 2014).

       Moreover, even if Second Amendment doctrine formed a perfect mirror of First

Amendment review – which it does not – Plaintiff's sole argument for the adoption of strict

scrutiny is fallacious because it incorrectly assumes that intermediate scrutiny is available only

for "time, place, and manner" regulations.  Yet the Supreme Court has identified numerous areas

where intermediate scrutiny is appropriate, including regulations of commercial speech, *see*

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980), the

regulation of adult businesses that have harmful secondary effects, *see City of Renton v. Playtime*

*Theatres, Inc.*, 475 U.S. 41 (1986), restrictions on symbolic conduct that carries a political

message, *see United States v. O'Brien*, 391 U.S. 367 (1968), and speech by government

employees on matters of public concern.  *See Garcetti v. Ceballos*, 547 U.S. 410 (2006).

Plaintiff's First Amendment analogy therefore supplies no reason to ignore either Defendants'

demonstration that no heightened scrutiny is warranted, *see* Def's Br. 21-23, or the Third

Circuit's conclusion that intermediate scrutiny is appropriate.  *See Drake*, 724 F.3d at 435.

### E.    The Dangers Posed by Machine Guns and Their Relationship to Criminal Activity Amply Justify Regulatory Efforts by Congress.

Much of the remainder of Plaintiff's brief rests on the dubious premise, discussed above,

that the Second Amendment guarantees individuals the right to military weaponry.[6]  *See supra*

Part B.  Thus, in responding to the important governmental objectives that warrant regulation of

machine guns, Plaintiff ignores entirely the precedent that authorizes such regulation of

"weapons of war" that have no non-military use and the indisputable fact that machine guns are

"especially dangerous," both to law enforcement officers and to the public at large.  *Compare*

Def's Br. at 24-26 (*quoting RSM, Inc. v. Herbert*, 466 F.3d 316, 318 (4th Cir. 2006) and *U.S. v.*

*Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999)) *with* Pl. Br. 24-27.  As Defendants' prior brief

explained, the physical risks posed by machine guns suffice to justify their regulation.[7]

Nor is it correct, as Plaintiff speculates, that there is no statistical support for legislative

history and judicial precedent regarding the criminal usage of machine guns.  *See* Pl. Br. 25.  For

example, as the exhibits attached to Plaintiff's brief demonstrate, as of 1995, at a time when

"over 240,000 automatic weapons were registered with the ATF," the National Crime

---

[6] *See* Def's. Br. 27-28 (contending that Congress lacks authority to regulate machine guns under the Commerce Clause because, unlike drugs, "Congress cannot outright prohibit firearms"); *id.* 30-32 (contending that Plaintiff had a "legitimate claim of entitlement" to a firearm for which possession is prohibited outright by the challenged statute).  Plaintiff's argument that strict scrutiny should apply to his equal protection claim, *id.* at 33, likewise rests on the supposition that the restrictions on machine guns burden a fundamental right, and has been routinely rejected. *See Kwong v. Bloomberg*, 723 F.3d 160, 170 n.19 (2d Cir. 2013) ("Like every Circuit to have addressed this issue, we . . . conclude that plaintiffs should not be allowed to use the Equal Protection Clause to obtain review under a more stringent standard than the standard applicable to their Second Amendment claim") (internal punctuation omitted); *Hightower v. City of Boston*, 693 F.3d 61, 83 (1st Cir. 2012).

[7] Indeed, although Plaintiff claims that the "M-16 at issue" is a "standard issue military rifle," Pl. Br. 12 n.5, ATF believes the rifle he manufactured omits a key safety feature of military M-16s: namely, a three-way or four-way selector switch with corresponding burst cam) that limits the rifleman to three-round bursts of automatic fire.  The U.S. Marine Corps adopted this feature to ensure that its personnel *could not* wastefully deplete their ammunition or endanger other personnel with uncontrolled, fully-automatic fire, and the U.S. Army subsequently decided likewise. *See generally* John Walter, Rifles of the World at 38 (3d ed. 2006); U.S. Army Field Manual 3-22.9 (2008).

Information Center ("NCIC") reported on "7,700 machine guns and submachine guns" (just two of the classes of automatic weapons) that had been stolen – over 3% of the total.  Pl. Br., Ex. C, at 4.  *See also id.* at 6 (reporting that, in a 1991 study, "35% of the *juvenile* inmates reported that they had owned a military-style automatic or semi-automatic rifle just prior to confinement") (emphasis added).[8]  In any event, if the eight decades of federal legislation regulating machine guns (including nearly three decades of prohibition on their manufacture) have succeeded in limiting the use of machine guns for criminal purposes, such success would hardly cast doubt on previous findings about the criminal utility of machine guns or their other dangers.  *See Drake*, 724 F.3d at 436-37 ("When reviewing the constitutionality of statutes, courts accord substantial deference to the legislature's predictive judgments.") (citation and internal punctuation omitted).

### F.    ATF's Interpretation that the Plain Text of § 922(o) Applies to Trustees as Individuals Is Not Central to Plaintiff's Claims And Is Proper in Any Event.

Notwithstanding Plaintiff's professed surprise that Defendants have not discussed at greater length his status "as an individual and as trustee of the Watson Family Gun Trust," Pl. Br. 30, or ATF's interpretation of 18 U.S.C. § 922(o) (requiring that trustees of unincorporated trusts be treated as individuals), he has framed the counts in his complaint in a manner that largely avoids placing those questions at issue.  *See Erie Ins. Exchange v. Erie Indem. Co.*, 722 F.3d 154, 159 (3d Cir. 2013) ("Plaintiffs are the masters of their complaints and are free to choose the statutory provisions under which they will bring their claims.").  Because Plaintiff's Second Amendment and congressional power claims rest on the nature of 18 U.S.C. § 922(o) and because his pleadings do not identify anyone treated differently, Plaintiff's trustee status is irrelevant to these counts.  *See* Def's. Br. 5, 32, 34-35.

---

[8] Plaintiff provides no citation for the claim that "only two" machine guns "have ever been used in a crime," Pl. Br. 26, and the statistics about stolen weapons reported in Plaintiff's own exhibit cast serious doubt on its correctness. *See* Pl. Br., Ex. C, at 4.

ATF's interpretation of the statute also has limited relevance to Plaintiff's due process claim. Although Plaintiff attempts to construe the NFA's definition of "person" to place the trustees of unincorporated trusts beyond the scope of firearms regulations, this idiosyncratic interpretation cannot overcome the fact that machine guns are "obvious contraband under federal law." *See* Pl. Br. 32; Def. Br. at 31 (*quoting United States v. Montrom*, 345 F. Supp. 1337, 1339 (E.D. Pa. 1972)). Indeed, Plaintiff's complaint attaches ATF's contrary interpretation of the statute, as set forth in a letter predating Plaintiff's Form 1 application. *See* Compl., ¶ 29 & Ex. A, ECF No. 1. As ATF explained at that time, "transfer[] [of] an NFA firearm to a trustee or other person acting on behalf of a trust . . . is made to this person as an individual (i.e., not as a trust)." *Id.* ATF's authoritative interpretation, not Plaintiff's, governs whether "an independent source" of law establishes a cognizable property interest in a machine gun, and thus, the validity of his due process claim. *See Bd. of Regents v. Roth*, 408 U.S. 564 (1972).

In any event, ATF's interpretation of the statute to require that transfers of NFA firearms to the trustees of unincorporated trusts be treated as transfers to individuals is a correct one. It is well-established that when acting as a trustee:

> [a] natural person . . . has capacity to take and hold property in trust to the extent
> the person has capacity to take and hold the property as beneficial owner; and []
> to administer trust property and act as trustee to the same extent the person would
> have capacity to deal with the property as beneficial owner.

Restatement (3d) of Trusts § 32 (2003). Indeed, because "[a] trust is not a legal 'person' which can own property," *id.* § 2, ATF reasonably concluded that the GCA's regulation of individuals applies to those individuals whether acting on their own or in their capacity as a trustee. *See* 18 U.S.C. § 921(a)(1)("individual" included in GCA definition of "person"). ATF's interpretation is therefore consistent with both principles of trust law and Congress's intent to prohibit the post-1986 manufacture of machine guns except pursuant to an official purpose. *See* 18 U.S.C. §

922(o); *Farmer v. Higgins*, 907 F.2d 1041, 1044 (11th Cir. 1990) ("Congress intended to prohibit the private possession of machine guns not lawfully possessed prior to May 19, 1986."). As the agency charged with broad authority to administer the complex, nationwide mechanisms of the GCA and NFA, with a large "body of expertise" in firearms, ATF's interpretation is entitled to an "appropriately high level of deference." *Hagans v. Comm'r of Social Sec.*, 694 F.3d 287, 305 (3d Cir. 2012); *Vineland Fireworks v. ATF*, 544 F.3d 509, 514 (3d Cir. 2008).

Finally, ATF's established interpretation likewise precludes Plaintiff's claim of detrimental reliance.  Plaintiff's disappointment in the revocation of ATF's erroneous approval of his application to make a machine gun is understandable (particularly given his representation that it is "impossible to reverse the modifications and eliminate the machine gun classification of the receiver").  Pl. Br. 3, n.1.  That frustration, however, does not transform ATF's ministerial error into a conspiracy by the federal government to violate the law to his detriment, particularly when ATF had already set forth its interpretation of the GCA and NFA as they apply to unincorporated trusts.  *Compare* Compl. Ex. A (dated Mar. 17, 2014) *with* Compl. ¶¶ 38-39 (dating Plaintiff's mistakenly approved application to June 24, 2014).  ATF acted in accordance with its existing policies and the "affirmative misconduct" required to support a detrimental reliance claim is therefore lacking.[9]  *See* Def's. Br. 37-38.

## CONCLUSION

As demonstrated in Defendants' motion to dismiss and reinforced above, the Court should dismiss the case or enter summary judgment for Defendants.

---

[9] Plaintiff correctly notes that Defendants are litigating a separate case in which ATF revoked approval of a Form 1 application, in which ATF corrected its error within days rather than weeks.  *See* Pl. Br. 32, n.8.  Undersigned counsel regrets erroneously referencing the facts in that case in a footnote in the opening brief here.  Contrary to Plaintiff's argument, however, the fact that ATF moved more swiftly to reverse its error in other instances simply demonstrates that ATF acted in good faith in its decisionmaking.  Indeed, contrary to Plaintiff's speculation about the use of "white[] out" on his other Form 1 application, *see* Pl. Br. 35, there is no dispute that Plaintiff only received a disapproval of that application, further reinforcing that there was no deliberate effort by ATF to mislead Plaintiff to his detriment.  *See* Compl. ¶ 43 (admitting application was disapproved when he received it).

Dated: February 11, 2015                    Respectfully submitted,

                                            JOYCE R. BRANDA
                                            Acting Assistant Attorney General

                                            ZANE D. MEMEGER
                                            United States Attorney

                                             /s/ *Eric J. Soskin*
                                            DIANE KELLEHER
                                            Assistant Branch Director
                                            ERIC J. SOSKIN
                                            DANIEL RIESS
                                            Trial Attorneys
                                            U.S. Department of Justice
                                            Civil Division, Rm. 7116
                                            20 Massachusetts Avenue, NW
                                            Washington, D.C. 20530
                                            Telephone: (202) 353-0533
                                            Fax: (202) 616-8460
                                            Email: Eric.Soskin@usdoj.gov
                                            *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

On February 11, 2015, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Eastern District of Pennsylvania, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2) or the local rules.

 <u>/s/ Eric J. Soskin</u>
Eric J. Soskin